[No. S007780. Dec. 14, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
TEDDY BRIAN SANCHEZ, Defendant and Appellant.

COUNSEL

Nina Rivkind, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Shirley A. Nelson and Judy Kaida, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—After defendant Teddy Brian Sanchez waived his right to a jury trial at the guilt and special circumstances phases, and submitted the case for a court trial on the basis of the preliminary hearing transcripts, the trial court found him guilty of the first degree murders of Juan Bocanegra, Juanita Bocanegra, and Woodrow Wilson Tatman (Pen. Code, § 187; all statutory references are to the Penal Code unless otherwise noted). The court found true the multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) as to the Bocanegra murders only, but found untrue the robbery-murder special-circumstance allegations that had been charged in the Tatman and Bocanegra murders (§ 190.2, subd. (a)(17)(i)). The court also found that defendant used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b) in both Bocanegra murders, and that defendant was guilty of the robbery of Tatman, but not guilty of the robbery of Juan and Juanita Bocanegra (§ 211). At the conclusion of the penalty trial, a jury returned a verdict of death. The trial court denied defendant's motion to modify the verdict and entered judgment. We affirm the judgment in its entirety.

I. FACTS

A. *Guilt Phase Facts*

1. *The Bocanegra Murders*

On the afternoon of February 3, 1987, the police found the bodies of Juan and Juanita Bocanegra in their home. Juanita was found in her sewing room, and Juan was found in the kitchen. Both had sustained extensive stab wounds and head injuries. A piece of fabric was tied loosely around Juanita's neck, and another piece of cloth was found on her right wrist.

Kern County Sheriff's criminalist Gregory Laskowski analyzed the blood found at the scene and concluded that both victims were killed where their bodies were found. The blood splatter evidence showed that the attack began in the hallway near the bathroom. The fight then moved to the kitchen where large amounts of blood indicated that a struggle took place throughout the room. The evidence indicated a fierce struggle occurred throughout the house. Small amounts of diluted blood in the bathroom suggested that someone cleaned up after the attack.

Laskowski also found evidence of two types of shoe tracks on the floor of the Bocanegra kitchen; one print had a "chevron pattern" and another, partial print, contained a "wavy sole design." A full wavy design shoe track in the bathroom was consistent with the print found in the kitchen. Both victims were found without shoes; Juanita's bloodstained slippers were found in the hallway.

Police found a knife block with four empty spaces in the kitchen. Two knives, without bloodstains, were in the kitchen sink. There were slash marks on the cabinets directly above the knife holder. That same evening, the police recovered a knife and sharpening stone that appeared to have blood on them. No fingerprints were found on these items. But police did find a bloody palm print belonging to defendant's accomplice Robert Reyes on the doorknob inside the Bocanegra front door. Autopsies performed on both Juan and Juanita revealed that they died as a result of massive hemorrhaging due to multiple stab wounds, although the type of instrument that inflicted the wounds could not be conclusively determined.

On February 4, 1987, the Bocanegras' Dodge Colt station wagon was found abandoned. There were extensive bloodstains on both the interior and exterior of the car. Fingerprints belonging to Joey Bocanegra were found on the interior driver's and right rear door windows and on the right rear door handle.

Two items of evidence linked defendant to the crimes. The missing Bocanegra television set was found in the same room at the Bakersfield Inn where defendant stayed at the time of the murders, and defendant sold the Bocanegras' vacuum cleaner to Maria Rodriguez, a clerk employed by the inn. The remaining evidence used to convict defendant was based primarily on the circumstances of the crime, and incriminating statements made by defendant to police investigator Bob Stratton, jailhouse informant Rufus Hernandez, and newspaper reporter Michael Trihey.

## 2. *The Tatman Murder*

Woodrow Wilson Tatman was a frail, undernourished, 72-year-old man who often drank alcohol and was confined to a wheelchair. He rented a room at the Bakersfield Inn, and spent his days drinking alcohol and watching television. Rose McGrew was employed by the inn as a maid and she also lived on the premises. She helped care for Tatman and had last been in his room on February 1, 1987. Maria Charboneau also worked and lived at the inn, and she took care of Tatman's Social Security checks, and managed his finances. In the first week of February, Tatman received two Social Security checks. On February 2, Charboneau gave Tatman between $80 and $100. That was the last time she saw him alive.

On the afternoon of February 4, 1987, McGrew noticed that Tatman's drapes were still drawn and that he had not yet picked up his mail, which included his Social Security check. McGrew entered the room and found Tatman's body, lying on the floor near his bed. He was covered with a bedspread. Tatman's television, radio and electric skillet were missing from the room.

The autopsy report indicated that Tatman was killed by "massive blunt force injury to the left chest" which collapsed his left lung and caused substantial hemorrhaging. The blow to the chest was consistent with a heel stomp or with the application of an instrument approximately two inches by three inches in size.

Tatman also sustained several superficial stab wounds to the chest and lower abdomen, as well as a head injury. It appeared that the superficial injuries had been inflicted intra or post mortem, and none contributed to death. It could not be determined what instrument caused the lower abdominal injuries, although it appeared that the chest wounds were inflicted by a screwdriver. Dr. John Holloway, the forensic pathologist who performed the autopsy, could not determine whether the wounds were caused by one or more individuals.

### a. *Statements Made to Jailhouse Informant Hernandez*

Rufus Hernandez was incarcerated with defendant for two months during 1987. He had been charged with receiving stolen property and second degree burglary. Defendant spoke to Hernandez about the Bocanegra murders and Hernandez entered into a plea bargain whereby he received six months in county jail and three years' probation in exchange for his testimony.

Hernandez testified that defendant told him he went with Joey Bocanegra to the Bocanegra house. Hernandez's testimony was inconsistent as to whether defendant said they went with the plan of robbing the Bocanegras or only with the plan of borrowing money from Juan Bocanegra. Defendant waited outside for Joey, but entered the house when he heard Joey and Juan arguing in the hallway. Defendant claimed he tried unsuccessfully to stop the fight by hitting Juan with a curved metal bar. He thereafter threw the bar in the front yard. Defendant did not say whether Joey had stabbed Juan before or after defendant hit him.

Juanita, who heard the commotion from another room, came out of the bedroom yelling. Defendant slipped in a puddle of blood as he jumped over Juan to reach Juanita. He thereafter grabbed Juanita and told Joey that he should "shut up" his mother. Joey then stabbed his mother repeatedly and pushed her into the sewing room, where she was found. Defendant did not tell Hernandez that he did anything other than hold Juanita; instead defendant claimed that he saw Joey stab both victims with a kitchen knife. Defendant ended his story with the comment that after the murders he threw the bar into the front yard, and that the knife was thrown into a canal. Defendant noted that Joey took the television, a toolbox, and his parents' hatchback automobile. Hernandez thereafter reported defendant's statements to police investigator Stratton.

### b. *Statements Made to Police Investigator Stratton*

On February 19, 1987, Stratton met with defendant in the Kern County jail. Defendant had contacted the police through his attorney because he wished to offer statements about the Bocanegra crimes. Before commencing the interview, defendant waived his right to counsel after receiving the admonitions required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Thereafter, he told Stratton that about 10 a.m., on the day of the Bocanegra murders, he met Joey Bocanegra on the street and spoke to him for a few minutes before Joey walked home. Defendant then walked by the Bocanegra house and observed Joey leaving the home. At that point, the interview with Stratton ended.

One week later, Stratton again spoke to defendant. At this point, defendant asked Stratton a series of hypothetical questions, including: "What if I was present in the house; what if Joey hit his dad after his dad had refused to give him some money; and what if Joey's dad hit him back and what if Joey got real mad and grabbed a knife and started stabbing his dad; what if Joey's mother didn't know what was happening because she was in another room?"

c. *Statements Made to Homicide Detective Boggs*

On March 27, 1987, after waiving his *Miranda* rights, defendant was interviewed about the Tatman murder by Homicide Detective Boggs. Defendant had already been arrested for the Bocanegra murders and agreed to talk to the officer because he believed he could be spending the rest of his life in prison.

Boggs testified that defendant told him he wanted to rob Tatman of his refrigerator because he needed one. Defendant told Boggs that, because he was so intoxicated (from ingesting alcohol and drugs) at the time of the robbery, he could not remember the sequence of events.

According to Boggs, defendant asked Reyes to pry open Tatman's bathroom window with Reyes's screwdriver. Once inside, Reyes removed the contents of Tatman's refrigerator, and defendant moved it to a room next door that had been rented by Vicky Ornalez, a friend of the perpetrators.

Defendant told Boggs that when he returned to Tatman's room, Tatman was awake and Reyes was standing over him with a screwdriver in his hand. Defendant claimed he had no idea why Reyes was acting this way because both men had discussed trying not to awaken Tatman while they removed his property. Reyes then hit Tatman in the chest, pulled Tatman off the bed and onto the floor, and made multiple lunging movements downward with the screwdriver in his hand. Defendant asserted that the bed partially blocked his view, but he nonetheless believed Reyes was stabbing Tatman. After Reyes completed the murder, both defendant and Reyes returned to Vickie Ornalez's room.

d. *Defendant's Postarrest Comments to Michael Trihey*

Michael Trihey was a reporter for the Bakersfield Californian. Prior to trial, he interviewed defendant five times about the charges pending against him. On April 25, 1988, the paper published a Trihey article entitled, *Accused Asks for Own Death, System Says No.* According to Trihey, defendant told him that he was a "triple murderer" and that the Bocanegras and Tatman were killed for their Social Security checks.

B. *Penalty Phase Evidence*

The prosecution introduced evidence of defendant's criminal activity involving the use or attempted use of force or violence. (§ 190.3, factor (b).)

On May 7, 1982, defendant assaulted store owner Hassan Ahmad Ammarie after defendant asked Ammarie to "get him some bacon" and Ammarie refused. Defendant stabbed Ammarie in the left shoulder and neck. Ammarie was hospitalized for two weeks following the attack.

On June 2, 1982, defendant attacked an acquaintance, Arthur Melendez Pena, after Pena refused to comply with defendant's demand for money.

Several witnesses who had testified at the preliminary hearing also testified at the penalty phase. Homicide Detective Boggs testified defendant had told him that after removing Tatman's possessions to Ornalez's room, he and Reyes "kicked back, drank some whiskey, smoked some dope, ate some food and just relaxed for the rest of the evening." Informant Rufus Hernandez and Police Detective Stratton also testified that defendant told Hernandez that he took an active role in the Bocanegra and Tatman slayings—including beating Juan and Juanita Bocanegra, and beating and assisting Reyes in stabbing Tatman. Stratton repeated Hernandez's statements to him that defendant and Joey Bocanegra went to Juan and Juanita's house and planned to rob them and that Tatman was robbed for his Social Security check. Rose McGrew, the Bakersfield Inn maid, repeated her guilt phase testimony about how she discovered Tatman's body.

With regard to the Bocanegra murders, Hernandez testified that defendant entered the house with a bar and "ran up to Joey's father and grabbed him and held him there until Joey went and got the knife and they just beat him and stabbed him." When Juanita walked out of her sewing room, defendant "rushed" her: "That's when they both started killing her. . . . They just stabbed her numerous times and hit her in the head a few times with the bar, and the time, at the same time of doing that I guess Joey somehow managed to get her back inside the room, I guess, while he was hitting her. . . ." The prosecution also introduced six color photographs of the victims and forty-eight other color photographs of the Bocanegra and Tatman crime scenes. Criminalist Greg Laskowski testified that the blood splatter in the hallway of the Bocanegra house was consistent with the prosecution's theory that multiple stabbings occurred there.

Defendant's penalty phase evidence consisted of testimony by friends, relatives, and a social anthropologist to the effect that defendant's dysfunctional and poverty-stricken, migratory family life severely hampered his ability to live a productive life. Defendant was rejected by his mother following his birth and was sent to live with his grandparents. When he was three years old, defendant's mother and stepfather unexpectedly wrenched

defendant from his grandparents' home to move to Arkansas. Shortly there-after, defendant's mother left defendant's stepfather, and took defendant and his half brother to California. Defendant's mother remarried a man with three children, and the couple thereafter had five additional children.

Defendant's mother and his stepfather were alcoholics and drug abusers who were violent with each other and the children. His grandparents, who were often in charge of defendant, also drank heavily and abused drugs. Both defendant's mother and stepfather died in their middle 30's of acute alcoholism. Defendant tried to take care of his siblings, but took drugs to escape his difficult life. He eventually turned to crime because he had no marketable job skills to prepare him for life as an adult.

Penalty phase defense counsel Gary Frank attempted to persuade the jury that defendant should receive a sentence of life without the possibility of parole and "spend the remainder of his life in prison."

## II. Discussion

### A. *Guilt and Special Circumstance Phase Issues*

#### 1. *Validity of Submission on Preliminary Hearing Transcripts*

On the second day of trial, July 11, 1988, defendant's chief guilt phase trial counsel, Toton, moved to submit the guilt and special circumstance phases on the preliminary hearing transcript. (Cocounsel Frank was also present during the proceedings.) Toton stated that defendant had agreed to waive his right to a jury trial and to confront witnesses, and to offer no additional evidence, subject to being allowed to argue the legal admissibility of the testimony. The next day, the court informed the parties that although it had not researched the issue, it would allow Toton to take tentative nonbinding waivers of constitutional rights from defendant. These nonbinding waivers included defendant's waiver of his right against self-incrimination.

The prosecutor, Ryals, opposed the motion. She stated that although she was willing to accept a stipulation from defendant that he was guilty of the charges and the special circumstance allegations and to proceed directly to a penalty trial, she would not stipulate to the submission of the case on the preliminary hearing transcripts.

On July 13, the court told the parties that it believed the *prosecution* had the right to a jury trial in the guilt and special circumstance phases but that

it would entertain further argument from defendant. Toton informed the court that the submission proposal was a compromise made by defendant at Toton's request. Defendant originally had wanted to plead guilty to the capital charges, but Toton would not consent to such a plea, believing that a guilty plea would amount to ineffective assistance of counsel under *People v. Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].

Ryals argued that if the court granted defendant's request to submit the case on the basis of the preliminary hearing transcripts, the prosecution would be foreclosed from proffering additional evidence gathered since the preliminary hearing. Ryals told the court that the additional evidence was essential to convict defendant and included testimony by Rodriguez (who purchased property stolen from the murder scenes), reporter Trihey, to whom defendant confessed, a police officer, and an employee of the Bakersfield Inn. Toton and Ryals agreed that the prosecution should be allowed to present additional evidence at the guilt phase, and that the defense would present rebuttal evidence and argue the case. Toton then stated to the court:

"Mr. Toton: Let me attempt then, because there is a lot of things going on, to see if my understanding is correct.

"We are prepared to waive jury trial on the guilt phase, on the special circumstance.

"Mrs. Ryals will present additional evidence. We will be able to present additional evidence and argue the matter.

"At penalty phase, it will be statutory, and, in other words, we understand that she has to put on the facts and circumstances of the case itself.

"Regular rules of evidence will apply at this point as if they were, as if there had been a jury trial on the guilt phase, and that Mr. Sanchez would be prepared to so waive his right to a jury trial on both and separately on both the guilt phase and the special circumstance.

"Mr. Frank and I would be prepared to join that on the People's consent to also join."

"The Court: It sounds all right, sounds good."

The trial court then allowed Toton to inform defendant of his constitutional rights, but ruled that the waivers would not bind defendant until the

following morning. Defendant waived his rights to trial by jury and to confront and cross-examine witnesses, but was not asked to and did not repeat his waiver of the right against self-incrimination. He repeatedly acknowledged, however, that he was waiving his constitutional rights and that his decision was entered "freely and voluntarily." Once the waivers were taken, the following colloquy occurred between the court and defendant:

"THE COURT: I take it that . . . Mr. Frank and Mr. Toton have talked to you at some length about the waivers?

"THE DEFENDANT: Yes, sir.

"THE COURT: Do you feel you understood them?

"THE DEFENDANT: Yes, sir, I believe I do.

"THE COURT: And you have had some time to think about it, at least since about 10:30 this morning, and they talked to you later, I take it?

"THE DEFENDANT: Yes, sir.

"THE COURT: And you have thought about it?

"THE DEFENDANT: Yes, sir.

"THE COURT: So far as you are losing your right to confront witnesses, those witnesses whose testimony will be presented to the court through the preliminary examination, you won't get a chance to cross-examine them in this court. You understand that?

"DEFENDANT: Yes sir.

"THE COURT: And you are giving that right up then?

"THE DEFENDANT: Yes, sir.

"THE COURT: Now, so far as the witnesses called . . . to augment the People's case and/or in your behalf, the live witnesses called in this case, you will have the right to confrontation and you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: I have to tell you that some of the cases in the state of California say that when you present a case to the judge to determine the guilt or innocence on the basis of the preliminary hearing transcript, that's sometimes called a slow guilty plea.

"THE DEFENDANT: Yes, sir.

"THE COURT: I don't know whether you have heard that language before, but it's used in the cases.

"THE DEFENDANT: Yes, sir.

"THE COURT: And I want you to be aware of that. I am not telling you how I am going to decide this case, but there is an aura of that in the cases and you should be aware of that fact.

"THE DEFENDANT: Yes, sir.

"THE COURT: And do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: And you are willing to give up your right to a trial by jury both as to the guilt of the two homicides alleged and of the other enhancements and the special circumstances; is that right?

"THE DEFENDANT: Yes.

"THE COURT: And you know you have the right, and we are ready to give you a jury on all those issues.

"THE DEFENDANT: Yes, your Honor, I understand all that.

"THE COURT: And you nonetheless give it up?

"THE DEFENDANT: Yes, sir."

Shortly thereafter, the court again confirmed that defendant understood he was waiving important constitutional rights:

"THE COURT: Are you satisfied with your decision?

"THE DEFENDANT: Yes, sir, I am very confident.

"THE COURT: Because you know we have got a record of everything here. It's going to be kind of hard to tell somebody else, gee, I didn't think about it. The judge coerced me. The [d]istrict [a]ttorney growled at me. My lawyers kicked me around. You know, it's going to be kind of hard to say that after you have been very candid with us here. Are you satisfied with that?

"THE DEFENDANT: Yes, sir, I am very satisfied.

"THE COURT: You seem satisfied. I believe you are satisfied. I will make that kind of a finding."

Defendant confirmed his intent to waive his jury trial and confrontation rights the following morning, but no mention was made by the court or counsel of defendant's right against self-incrimination.

 Defendant now contends that because submitting the case on the basis of the preliminary hearing was tantamount to pleading guilty (or a slow plea), the trial court committed reversible error under *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086] (hereafter *Bunnell*) when it failed to advise in the *binding* waivers that defendant would be relinquishing his Fifth Amendment right against self-incrimination. He also contends that the court's failure to advise him of the direct consequences of a conviction requires reversal, as does the fact that he was unaware of the legal ramifications of his initial submission and waiver.

a. *Slow Plea*

 In *Bunnell,* this court held that a stipulation to submit a case for decision on preliminary hearing transcripts must be accompanied by advice regarding the personal waiver of a defendant's constitutional rights to jury trial, silence, and to confront and cross-examine, i.e., *Boykin-Tahl* advice and waivers. (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1960) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) The *Bunnell* court held, "the record shall reflect that he had been advised of his right to a jury trial, to confront and cross-examine witnesses, and against self-incrimination. . . . Express waivers of the enumerated constitutional

rights shall appear. . . . In all guilty plea and submission cases the defendant shall be advised of the direct consequences of conviction such as the permissible range of punishment provided by statute . . . ." (*Bunnell, supra,* 13 Cal.3d at p. 605.)

Thereafter, in *People* v. *Hendricks* (1987) 43 Cal.3d 584 [238 Cal.Rptr. 66, 737 P.2d 1350] (hereafter *Hendricks*) we held that the mandate of *Boykin-Tahl* applies only to pleas of guilty and submissions on the preliminary hearing transcript, or slow pleas, "by virtue of which [defendant] surrenders one or more of the three specified rights." (*Id.,* at p. 592.) A slow plea is defined as a submission of the guilt phase to the court on the basis of the preliminary hearing transcripts that is tantamount to a plea of guilty because guilt is apparent on the face of the transcripts and conviction is a foregone conclusion if no defense is offered. (*People* v. *Wright* (1987) 43 Cal.3d 487, 496 [233 Cal.Rptr. 69, 729 P.2d 260] [hereafter *Wright*].) Deciding whether a submission is a slow plea is often difficult, and courts generally review such pleas based on defendant's willingness to contest guilt during the court trial. "Submissions that are not considered slow pleas include those in which (1) the preliminary hearing involves substantial cross-examination of the prosecution witnesses and the presentation of defense evidence or (2) the facts revealed at the preliminary examination are essentially undisputed but counsel makes an argument to the court as to the legal significance to be accorded them." (*Ibid.*; see *In re Mosely* (1970) 1 Cal.3d 913, 924-925, fn. 9 [83 Cal.Rptr. 809, 464 P.2d 473] [extending, in dictum, *Tahl* advisement and waiver requirement to cases in which defendant's submission on preliminary hearing transcript is tantamount to a guilty plea].)

Defendant claims that because counsel did not argue for acquittal of all charges and presented no defense to some of the charges, his submission was a slow plea tantamount to a guilty plea. But as the *Wright* court observes, "[a]n appellate court, in determining whether a submission is a slow plea, must assess the circumstances of the entire proceeding. It is not enough for a reviewing court to simply count the number of witnesses who testified at the hearing following the submission. A submission that prospectively appeared to be a slow plea may turn out to be part of a full-blown trial if counsel contested the sufficiency of evidence for those counts or presented another potentially meritorious legal argument against conviction. Conversely, a submission that did not appear to be a slow plea because the defendant reserved the right to testify and call witnesses or to argue the sufficiency of the evidence (*see People* v. *Guerra* (1971) 21 Cal.App.3d 534, 538 [98 Cal.Rptr. 627]) may turn out to be a slow plea if the defense presented no evidence or argument contesting guilt. [¶] If it appears on the

whole that the defendant advanced a substantial defense, the submission cannot be considered to be tantamount to a plea of guilty. Sometimes, a defendant's best defense is weak. He may make a tactical decision to concede guilt as to one or more of several counts as part of an overall defense strategy. A submission under these circumstances is not a slow plea, and the trial court is not constitutionally compelled by *Boykin* and *Tahl* to administer the guilty-plea safeguards to assure that the tactical decision is voluntary and intelligent. The advisements and waivers in such a case are required only as a matter of the judicial policies that underlie our decision in *Bunnell*." (*Wright, supra*, 43 Cal.3d at pp. 496-497.)

 In the present case, defendant's submission on the preliminary hearing transcripts was not a slow plea. Defense counsel Toton conducted substantial cross-examination of the prosecution witnesses during the preliminary hearing. Toton also called prosecution witnesses Hernandez and Detective Stratton to testify for the defense, and questioned Hernandez about whether he had agreed to testify against defendant with the intent of making a deal in his own case.

In addition, following the close of the prosecution's guilt phase presentation, Toton renewed his motions to strike portions of the trial testimony of Maria Rodriguez, Detective Boggs, and William Freeman (the patrolman who seized two screwdrivers from defendant that had been stolen from the Bocanegra residence), and then moved for a judgment of acquittal of all the charges.

In arguing the motion for acquittal, Toton asserted there was insufficient evidence of defendant's guilt of the robbery and murder charges, and that the People failed to charge properly the special circumstance allegations. In addition, Toton asserted that no physical evidence linked defendant to the Bocanegra murders. He argued that the prosecution presented no evidence of premeditation in those murders, and that defendant's hypothetical questions to Detective Stratton should not be used as evidence of murder. Toton also pointed out that defendant's incriminating statements to newsman Trihey implied knowledge of the crime, but not intent to kill, that there was no evidence that defendant robbed the Bocanegras or that defendant had the specific intent to kill either the Bocanegras or Tatman.

Toton's closing argument following the guilt phase was equally extensive. He asserted there was insufficient evidence, as a matter of law, to prove beyond a reasonable doubt that defendant committed the charged robberies and the Bocanegra murders because the testimony of Hernandez and Trihey

was not credible. At best, he argued, the evidence in the Bocanegra murders supported a verdict of voluntary manslaughter. He also asserted that the prosecution had failed to prove the specific intent to kill necessary to support the special circumstance allegations.

It therefore appears that defense counsel's cross-examination was substantial, and that he argued constantly that the facts as presented at the preliminary hearing should be viewed as not supporting first degree murder convictions. These facts support the People's assertion that defendant's submission on the preliminary hearing transcripts for the guilt and special circumstance phases of the trial was not tantamount to a guilty plea. (*Wright, supra*, 43 Cal.3d at p. 496.)

For submissions not tantamount to a guilty plea, a trial court's failure to advise the defendant of his right against self-incrimination is implicated only to the extent defendant *surrendered* the right. (*Hendricks, supra*, 43 Cal.3d at p. 592.) Through the submission stipulated to here, defendant never surrendered his self-incrimination privilege because he chose not to testify during the guilt phase proceedings. Because defendant never surrendered his right against self-incrimination, there was no requirement of a personal, on-the-record waiver. (*Ibid.*)

### b. *Consequences of Conviction*

■ Defendant next contends that the trial court committed reversible error when it failed to advise him that a conviction of guilt and special circumstances could lead to a death sentence. Without an understanding of the possible consequences of submitting the guilt and special circumstances on the preliminary hearing transcripts, defendant asserts, any waiver of constitutional rights is invalid.

We find defendant's argument unavailing. On submission on a transcript of preliminary hearing, a defendant must be told of the potential maximum and minimum terms of imprisonment. (*People* v. *Dakin* (1988) 200 Cal.App.3d 1026, 1033 [248 Cal.Rptr. 206].) Nonetheless, a court's failure to comply with this rule requires reversal only if it is reasonably probable a result more favorable to the defendant would have been reached in absence of the error. (*Wright, supra*, 43 Cal.3d at p. 495; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We find no such prejudice. Defendant had been thoroughly advised by counsel of the consequences of pleading guilty and of the consequences of waiving his constitutional rights. He was well aware that he faced a possible death sentence, and, according to reporter

Trihey, even asked for his own death. It is clear from the record that defendant would have waived his right to a jury trial and insisted on the submission of the guilt phase on the preliminary hearing transcripts even if he was specifically told by the court that he faced a possible death sentence.

### c. Other Claims

■ Defendant asserts that he was not told (1) of the legal ramifications of the agreement between Toton and Ryals to limit evidence to that presented at the preliminary hearing, and (2) of the absence of a defense to the Tatman robbery and the Tatman first degree felony-murder charges. Defendant especially notes that he was unaware the defense challenge to the charges would rest solely on the ground of insufficient evidence. Moreover, defendant claims, Toton never explained he limited his defense to "rebuttal" witnesses. The lack of any explanation as to the procedural aspects of submitting the case on the preliminary hearing transcripts, defendant asserts, renders his waiver and submission void.

As to defendant's claims that he was unaware of the legal ramifications of his submission and waiver, and the probability of conviction, we conclude no such advisement was required in light of defendant's reservation of his right to present additional evidence and to contest his alleged guilt in argument to the court. As the People observe, *Bunnell, supra,* 13 Cal.3d 592, requires that a defendant be advised of the probability that his submission will result in a conviction of the offenses only "[i]f a defendant does not reserve the right to present additional evidence and does not advise the court that he will contest his guilt in argument to the court . . . ." (*Id.,* at p. 605.)

### 2. Sufficiency of the Evidence

■ Defendant contends there was insufficient evidence of premeditation and deliberation to support his convictions for the first degree murders of both Juan and Juanita Bocanegra. In the alternative, he asserts that even if there was sufficient evidence to convict him of the Bocanegra murders on an aider and abettor theory, the evidence supported only a second degree murder conviction because the prosecution failed to prove that Joey intended to kill his parents with premeditation and deliberation, and that defendant aided and abetted in the murders.[1] ■ We need not be convinced beyond a reasonable doubt that the murders were premeditated. Our inquiry on

---

[1]Defendant's crimes were committed in February 1987, eight months before our October 1987 decision in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], which overruled *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672

appeal "in light of the whole record [is] whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People* v. *Davis* (1995) 10 Cal.4th 463, 511 [41 Cal.Rptr.2d 826, 896 P.2d 119] [hereafter *Davis*]; see *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].) The standard of review is the same when the People rely mainly on circumstantial evidence. (*People* v. *Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481]; see also *People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996] [conviction based on circumstantial evidence will be affirmed if circumstances reasonably justify trier of fact's findings].) The record does not support either of defendant's contentions.

█ As we have observed in numerous cases, we apply the tripartite test of *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], in deciding whether the evidence is sufficient to support a finding of premeditation and deliberation based on these three factors: (1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing. (*Id.*, at pp. 26-27; *People* v. *Wharton* (1991) 53 Cal.3d 522, 546-547 [280 Cal.Rptr. 631, 809 P.2d 290] [hereafter *Wharton*]; cf. *People* v. *Haskett* (1982) 30 Cal.3d 841, 849, fn. 1 [180 Cal.Rptr. 640, 640 P.2d 776].) "[T]his court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson, supra*, 70 Cal.2d at p. 27.)

We have recently explained that the *Anderson* factors do not establish normative rules, but instead provide guidelines for our analysis. In *People* v. *Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101] we observed: "The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law in any way."

Thereafter, in *People* v. *Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159] (hereafter *Perez*) we reiterated the *Thomas* statement, and added that "[t]he *Anderson* guidelines are descriptive, not normative.

---

P.2d 862]. Therefore, whether or not defendant was the actual killer, we must find he harbored the intent to kill for the multiple-murder special circumstance to apply (*People* v. *Turner* (1984) 37 Cal.3d 302, 328-329 [208 Cal.Rptr. 196, 690 P.2d 669].) Although the parties do not raise the issue because the case was tried to the court (and thus the "intent to kill" requirement did not arise in the usual context of jury instructions), we note the "intent to kill" requirement applied nonetheless.

[Citation.] The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.] [¶] In identifying categories of evidence bearing on premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. . . . The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (See *Davis*, *supra*, 10 Cal.4th at p. 511.)

Finally, we have recognized that it is not necessary that the *Anderson* "factors be present in some special combination or that they be accorded a particular weight." (*People* v. *Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Nonetheless, we are guided by the factors in our determination whether the murder occurred as a result of "preexisting reflection rather than unconsidered or rash impulse." (*Ibid.*)

██ We find substantial evidence supports the trial court's finding that Joey Bocanegra intended to kill his parents, that he premeditated and deliberated the murders, and that defendant can be found vicariously liable for the murders as an aider and abettor. ██ As we have observed, an aider and abettor must act with knowledge of the criminal purpose of the perpetrator and with an intent either of committing, or of encouraging or facilitating commission of, the offense. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318] [hereafter *Beeman*].) We have also recognized that if the aider and abettor undertakes acts "with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense." (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; see also §§ 31, 190.2, subds. (c) & (d), 971.) Thus, the basis of liability for the perpetrator applies to the aider and abettor and extends to "the natural and reasonable consequences of the acts he knowingly and intelligently aids and encourages." (*Beeman*, *supra*, 35 Cal.3d at p. 560.) ██ As we explain, we conclude that defendant shared Joey's intent to kill, and in assisting Joey in committing the crimes, understood, and facilitated, the full extent of Joey's criminal purpose.

Hernandez testified, and defendant admitted to Detective Stratton, that defendant initially waited outside while Joey entered his parents' house. Defendant then entered the house after hearing the sounds of a fight between Joey and Juan. Defendant told Hernandez that he went inside the house to break up the fight between Joey and his father, but the facts belie his stated

intent. When defendant entered the house, he saw Joey fighting with his father. Rather than come to Juan's aid, defendant grabbed a curved metal bar and commenced beating Juan.

Joey's actions, according to defendant's statements to prosecution witnesses, indicated that Joey deliberated over his father's killing. Joey initially struck Juan in the hallway and then, in the kitchen, obtained a knife that he used to stab Juan. In our view, Joey formed a clear intent to kill, at the latest, during the altercation with his father, and obtained a kitchen knife to carry out that plan. ■■■ Our cases hold that planning activity occurring over a short period of time is sufficient to find premeditation. " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Perez, supra,* 2 Cal.4th at p. 1127, quoting *People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7].)

■■■ There was also ample evidence of motive. The evidence supports a strong inference that Joey entered his parents' house to rob them. When his father resisted the robbery, Joey was motivated to murder him in order to gain access to both money and tangible goods, including a television set. Substantial evidence supports a finding that Joey believed Juan stood in the way of his plan.

Finally, the trial court could infer from the evidence that the manner of killing tended to demonstrate Joey acted with premeditation and deliberation. The attack occurred in a series of rooms, indicating that Juan's repeated attempts to break away from his murderers were consistently thwarted by the attackers' relentless pursuit of him, even after he was gravely wounded. A rational finder of fact could infer that the manner of killing, when combined with Joey's retrieval of the knife in the kitchen, and defendant's retrieval of a metal bar used in clubbing a defenseless Juan, is sufficient to support the trier of fact's implied finding that Joey formed the plan to kill his parents during the altercation, located the murder weapon, and along with defendant, deliberately murdered his father. (See *Davis, supra,* 10 Cal.4th at p. 511.)

The same evidence supports the trial court's finding that defendant shared Joey's intent and plan to kill Juan, and thus was liable, as an aider and abettor, for Juan's murder. (*Beeman, supra,* 35 Cal.3d at p. 560.) The killing of Juan ended after a prolonged knife attack and beating from which Juan attempted to defend himself. Defendant's personal involvement in the murder was substantial. Far from merely acting as a lookout, or beating Juan after he was already dead, defendant was actively involved in assisting Joey

in Juan's murder. Defendant's admitted act of arming himself with a curved metal bar before joining the altercation between Joey and Juan indicates he shared Joey's plan. (*Perez, supra*, 2 Cal.4th at p. 1126 [evidence of planning activity shown by defendant's act of surreptitiously entering victim's house and obtaining knife from victim's kitchen]; *Wharton, supra*, 53 Cal.3d at p. 547 [defendant's act of retrieving hammer constituted planning activity].) From this evidence, the trier of fact could reasonably infer defendant knowingly engaged or assisted in Juan's murder as an aider and abettor. (*Beeman, supra*, 35 Cal.3d at p. 556.)

As to Juanita's murder, defendant asserts the evidence similarly does not support the conviction. He claims that he "did not personally kill Juanita [because] she was stabbed to death by Joey." He asserts that there is "no evidence in the record that [he] held Juanita down, helped push her back to the sewing room, or had any contact with her while Joey was stabbing her." He contends that there is no evidence to support the People's theory that defendant aided Joey by hitting Juanita with a bar and that "[t]here is simply no evidence that [his] initial grabbing of Juanita actually aided, or even was intended to aid, Joey's subsequent stabbing of his mother." Finally, defendant asserts in his reply brief that his "efforts to tie and gag Juanita are altogether inconsistent with an intent to kill her."

Again, the evidence supports the court's verdicts and refutes defendant's contention. Hernandez testified defendant told him that during the murder of Juan, Juanita screamed. Defendant grabbed Juanita and told Joey to "shut her up." Joey then stabbed his mother 26 times. A bloodstained garment was wrapped around Juanita's neck, and her wrists had been tied together with a piece of fabric. The pathologist (Holloway) opined that Juanita died of the stab wounds and that the ligature constriction of her neck was a possible contributing cause. She also had severe scalp injuries that Holloway concluded were consistent with those inflicted by a long bar or pipe less than one-half inch in diameter, similar to the instrument used by defendant to inflict Juan's scalp wounds. The trial court could reasonably infer from the evidence that Juanita was killed in order to keep her from being a percipient witness to the murder of her husband. Thus, viewing the evidence in the light most favorable to the People, we conclude a "rational trier of fact" could have been persuaded "that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*Perez, supra*, 2 Cal.4th at p. 1125.) Defendant's participation in Juanita's murder, like his aiding and abetting in Juan's killing, clearly supports a finding that defendant aided and abetted her murder. (*Beeman, supra*, 35 Cal.3d at p. 560.)

Finally, defendant contends that the evidence showing he "waded into a fight" already in progress and struck the victim several ineffectual blows

with an instrument found on the scene, proves no more than an unlawful killing. When nothing further is shown, defendant claims, the presumption is that the evidence supports differing degrees of guilt, based on the same conduct. Thus, defendant asserts, he should have been convicted of murder in the second degree. (See *People* v. *Woods* (1992) 8 Cal.App.4th 1570, 1586-1587 [11 Cal.Rptr.2d 231]; see also *People* v. *Wells* (1938) 10 Cal.2d 610, 616-617 [76 P.2d 493].)

We reject defendant's interpretation of the evidence. Far from "wading into a fight" and being ineffectual, we have shown how the evidence clearly reflects that defendant aided and abetted Joey in killing both Juan and Juanita. We thus conclude there was sufficient evidence to support the verdict finding defendant guilty of first degree murder.

### 3. *Denial of Motions to Withdraw*

Defendant asserts that his right to the effective assistance of counsel under the federal and state Constitutions was violated when the trial court denied two motions to withdraw filed by defense counsel Toton and Frank.

The first motion was filed on the ground that defendant refused to follow their advice by speaking with newsman Trihey and discussing the Bocanegra murders. In denying the motion, the court asked defendant if he felt he could continue to work with counsel. The court told defendant: "You've got a little say in it. Whatever you've done, if it's damaged your case, it's damaged your case; if it hasn't damaged your case, it hasn't. What's done is done. And it really comes down to a question now and again whatever has been done, whatever has been said is going to be there whether you have these attorneys or another attorney or attorneys appointed to represent you." The court then told defendant it would not relieve counsel from the case unless defendant told the court he no longer trusted them. Defendant replied: "There is a little bit of mistrust there, but, you know, I'm willing to stay with them, but if they want out, you know, I won't stop them." The court thereafter denied the motion to withdraw, informing counsel that it had the "highest regard" for both attorneys, but whatever defendant had done "has happened and any attorney on the case is going to have to live with that."

Two months later, following an article published in the Bakersfield Californian in which Trihey wrote that defendant told him he was "a triple killer" who "deserves to die for his crimes," Frank filed a second motion to withdraw on the ground that his continued representation of defendant would require the proffering of perjured testimony, resulting in violations of the

Rules of Professional Conduct. Toton joined the motion, and the court again denied it on the ground that trial was to begin shortly thereafter.

Defendant claims that the court's failure to grant both motions was an abuse of discretion that led counsel to submit the guilt phase on the preliminary hearing transcripts and resulted in a complete breakdown in the attorney-client relationship.

The determination whether to grant or deny a motion by an attorney to withdraw is within the sound discretion of the trial court and will be reversed on appeal only on a clear showing of abuse of discretion. (*People* v. *McKenzie* (1983) 34 Cal.3d 616, 629 [194 Cal.Rptr. 462, 668 P.2d 769]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 282 [247 Cal.Rptr. 1, 753 P.2d 1052].) We find no abuse of discretion on this record. As the People observe, implicit in the court's denial of the motions is the finding that defendant's discussion of his case with the media was not an indication of his distrust or dissatisfaction with counsel. Rather, the conduct was merely indicative of his unwavering desire to admit culpability and to atone for his crimes. Indeed, allowing counsel to withdraw would not have alleviated any prejudice to defendant caused by his contact with the press, nor does the record indicate that denying the motion to withdraw influenced defendant's desire to submit the guilt issue on the basis of the preliminary hearing transcripts. Even though counsel were dissatisfied with defendant's failure to heed their advice and not discuss the case with the media, the record shows defendant's right to counsel was not jeopardized by counsel's continuing representation. Thus, because defendant does not show that any disagreement with counsel resulted in a complete breakdown in the attorney-client relationship that jeopardized his right to a fair trial, we conclude the trial court did not abuse its discretion in denying counsels' motions to withdraw. (See *People* v. *Douglas* (1990) 50 Cal.3d 468, 542 [268 Cal.Rptr. 126, 788 P.2d 640] (conc. opn. of Mosk, J.) [In reviewing denial of motion to substitute attorneys, the court "focuses on the ruling itself and the record on which it is made. It does not look to subsequent matters . . . ."].)

### 4. Disciplinary Proceedings Against Cocounsel Toton

#### a. Background

On July 26, 1988, the last day of testimony in the guilt and special circumstances phase of trial, an article titled *Bakersfield Attorney Faces Disbarment* appeared on the front page of the morning edition of the Bakersfield Californian. The article noted that Toton, "attorney for triple

killer Ted Sanchez," faced potential disbarment for allegedly failing to (1) notify his clients of receipt of funds, (2) turn over funds in a timely manner, (3) provide an accounting of receipts, and (4) communicate with his clients. In addition, the article observed that Toton was scheduled to appear before the California State Bar's Review Department, which would thereafter make its disciplinary recommendation. Toton alone was aware of the proceedings prior to the article's publication.

The court met in chambers with Ryals, Toton, Frank, and defendant to discuss the article. Ryals requested the court "make inquiry as to [defendant], as to his knowledge of the problems Mr. Toton is facing, of whether or not we are being rushed through this trial for Mr. Toton's benefit, if there is so much as a rush . . . ." After Frank agreed to discuss the disciplinary proceedings with defendant that evening, the court agreed to meet in camera with the defense the following morning.

When Frank and defendant met with the court in camera the next morning, Frank indicated that he had met with defendant and learned that defendant had read the July 26 article, and that Frank had no knowledge of the disciplinary proceedings prior to reading the article. The following colloquy then occurred:

"THE COURT: One of the things that concerns me about this incident is the fact of the date of August 25th and the fact that a jury trial was waived in this case, and now we're at that stage of the case where a [Penal Code section] 1118.1 is under submission. And I suppose somebody reviewing this case could say one of the reasons maybe that Mr. Toton suggested that the jury trial be waived was the fact that the trial could be completed prior to the time that the Californian suggests that there's going to be some kind of a ruling in his case. As—and clearly if we had had a jury, we would still have been going at that time, and I really seriously doubt whether we would have been in a position even to have begun to take evidence as of the 25th day of August. That situation worried me a little bit.

"And I wonder if you have discussed this with your client.

"MR. FRANK: Yes, your Honor. I advised [defendant] that the article certainly did imply that Mr. Toton's motivation for pursuing the presentation of the case in the manner in which he has, at least indicated, that perhaps he did that because of his own personal problems, plans or agenda.

"I advised [defendant] that he had the right to be represented by an attorney who was completely and absolutely free from any sort of conflict,

that [defendant] had the right to have an attorney whose decision-making process was unfettered by any of his own personal plans or problems, and that he had the right to have an attorney whose representation and whose decision-making process was based not on any of the attorney's considerations but on the best interests of [defendant], the client in this case."

The court then questioned defendant to verify that he had spoken to Frank about the disciplinary proceedings, that he had read the Bakersfield Californian article, and that he was unaware of any disciplinary action against Toton prior to the date of the article. The court asked defendant if he believed the article implied that "one reason Mr. Toton was pushing this case forward was because of his own personal time considerations." Defendant replied: "Not really sir, because we had discussed—you know, this was part—*I wanted to go this way in the beginning anyway.* So there was really—I never really felt that he was doing it for his own incidences [*sic*]."

The court confirmed defendant's earlier position that it was his idea alone to "waive the jury under any circumstances." The court next asked defendant if he wanted to make a motion for mistrial "and for certain other motions in view of the publicity that this has gotten?" The following discussion ensued:

"THE COURT: What I'm concerned [about] is that something will happen down the line and then you will say, gee, I didn't know what I was doing; I should have asked for a mistrial at that point in time. That would probably be too late, because I'm probably getting an indication that you want to waive any problems that Mr. Toton's difficulties might have in this case. Is that right?

"THE DEFENDANT: Yes.

"THE COURT: I didn't make that very clear.

"THE DEFENDANT: Yeah.

"THE COURT: What I'm saying is, I don't want you to go down the line and then all of a sudden say, gee, I've changed my mind.

"THE DEFENDANT: Yeah.

"THE COURT: Probably you can't do that. You understand that?

"THE DEFENDANT: Yes, I understand that.

"THE COURT: Are you satisfied with the state of the record at this point?

"THE DEFENDANT: Yes sir. I'm very satisfied.

"THE COURT: Nobody threatened you to get you to say this?

"THE DEFENDANT: No, sir . . . .

"THE COURT: Are you satisfied, sir, that Mr. Toton's dilemma with the State Bar had nothing to do with the waiver of the jury trial?

"MR. FRANK: I am, yes.

"THE COURT: And are you, Mr. Sanchez?

"THE DEFENDANT: I am too."

The parties agree Toton was not disbarred until March 31, 1989, well after defendant's trial was completed. Against this background, we address below defendant's several arguments regarding Toton's disbarment and its effect, if any, on the fairness of defendant's trial.

b. *Federal Constitutional Claims*

 Defendant first asserts that on learning of the pending disciplinary action against Toton, the court was required to "terminate" Toton's appointment as defendant's counsel. Defendant claims that the court's failure to remove Toton as counsel denied him his right to the effective assistance of counsel under the Sixth Amendment, denied him due process under the Fourteenth Amendment, and deprived him of a reliable determination of penalty under the Eighth Amendment.

We are not persuaded. In order to establish a violation of the right to effective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's performance prejudiced defendant's case in such a manner that his representation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693, 104 S.Ct. 2052] [hereafter *Strickland*]; *Wharton, supra,* 53 Cal.3d at p. 575.) Moreover, "a court need not

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland, supra,* 466 U.S. at p. 697 [80 L.Ed.2d at p. 699].) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698].) If defendant fails to show that he was prejudiced by counsel's performance, we may reject his ineffective assistance claim without determining whether counsel's performance was inadequate. (*Strickland, supra,* 466 U.S. at p. 697 [80 L.Ed.2d at pp. 699-700].)

To support his federal constitutional argument, defendant relies on two Illinois cases, in which the appellate courts reversed sentences of murder in cases where the same defense attorney was subject to disciplinary proceedings during separate murder trials for the same crime. (*People* v. *Williams* (1982) 93 Ill.2d 309 [67 Ill.Dec. 97, 444 N.E.2d 136] [hereafter *Williams*]; *People* v. *Rainge* (1983) 112 Ill.App.3d 396 [68 Ill.Dec. 97, 445 N.E.2d 535] [hereafter *Rainge*].)

In *Williams*, a jury convicted the defendant of two counts of murder, kidnapping, and rape, and sentenced him to death. The Illinois Supreme Court affirmed defendant's conviction and sentence, over his protest that he had been denied effective assistance of counsel. While the defendant's petition for rehearing on the appeal was pending, the defendant's attorney appeared before the same court in a disciplinary action in which the Hearing Board and Review Board of the Illinois Attorney Registration and Disciplinary Commission recommended that the attorney be disbarred because of misconduct in handling the estate of a client. The Illinois Supreme Court ordered the attorney disbarred. (*In re Weston* (1982) 92 Ill.2d 431 [65 Ill.Dec. 925, 442 N.E.2d 236].)

Based on the information presented to it in the attorney disciplinary action, the *Williams* court granted the defendant's petition for rehearing. After reconsidering the effectiveness of counsel in light of the disbarment, the court reversed the defendant's conviction and sentence. The court held that even though the evidence supported defendant's conviction, in light of the disbarment it "no longer can say, with any degree of assurance, that [the defendant] received the effective assistance of counsel guaranteed by the Constitution." (*Williams, supra,* 444 N.E.2d at p. 142.)

In reversing the conviction, the *Williams* court cited numerous examples of inaction by counsel that it believed demonstrated ineffective assistance,

including "the failure to make a motion to suppress the physical evidence seized from [defendant's] car—evidence which was perhaps crucial to the State's case; the failure to object to the testimony concerning the Canadian study on hair comparisons; the failure to object to prejudicial material received by [the defendant's] jury . . . ; the failure to object to testimony concerning the good character of the decedents . . . ." (444 N.E.2d at pp. 142-143.) The court admitted that it had "originally examined" in the appeal "the more significant errors . . . and found no plain error." (*Id.*, at p.143.) But in light of counsel's disbarment, the court reconsidered its original affirmance of the conviction. The court stated: "[W]e are now aware, for the first time, of the unique circumstances under which counsel in this case was operating at the time of the capital trial. In light of these facts, we can no longer characterize counsel's decision not to make the motion to suppress . . . evidence or to take other action on his client's behalf as professional misjudgments made with full knowledge of the applicable law and the facts. . . . [¶] It is apparent to us that the unique facts in this case require that we forgo application of either of the established tests, normally applied in determining whether a defendant has been deprived of his constitutional right to the assistance of counsel. [Citations.] As we originally indicated, the voluminous record here shows that there were many instances where counsel made able and vigorous objections and presentations, and we cannot characterize his performance as actual incompetence or as of such a low caliber as to reduce the trial to a farce or sham. We believe, however, considering the unique circumstances and sequence of events in this capital case, which will rarely, if ever, be duplicated, that the interests of justice require that . . . Williams be granted a new trial." (*Ibid.*)

Defendant Williams's two codefendants, Rainge and Adams, were separately tried and also found guilty of the above murders and sentenced to life imprisonment. (*Rainge, supra*, 445 N.E.2d 535.) Defendant Rainge was represented by the same attorney who had represented Williams. The Illinois Court of Appeal held in abeyance its decision in the *Rainge* case pending the decision in *Williams, supra*, 444 N.E.2d 136, because "numerous issues raised in the supreme court by Williams, were common issues based upon the same record which were raised in the instant appeal by Rainge and Adams." (*Rainge, supra*, 445 N.E.2d at p. 544.) Thereafter, the *Rainge* court reversed Rainge's murder convictions because "the similar interests of Williams and Rainge and the similar issue raised on the same record require that defendant Rainge be granted a new trial. As in [*Williams*], we base our decision upon 'the unique circumstances and sequence of events in this capital case which will rarely, if ever, be duplicated.' " (*Rainge, supra*, 445 N.E.2d at p. 547, quoting *Williams, supra*, 444 N.E.2d at p. 142; but see *People* v. *Neal* (1984) 123 Ill.App.3d 148 [78 Ill.Dec. 695, 462 N.E.2d 814,

816] [distinguishing *Williams* and *Rainge* and finding same counsel not incompetent in noncapital case].)

 Defendant asserts that we should follow the *Williams* and *Rainge* courts and find that on the "unique facts" of this case, the State Bar proceedings against Toton tainted his representation of defendant and compromised the constitutionality of the conviction and sentence. But unlike Williams, who had asserted "numerous instances of inaction by counsel to demonstrate he was denied the effective assistance of counsel" (*Williams*, *supra*, 444 N.E.2d at p. 142), defendant points to no "instances of inaction" that, in light of the pending discipline, would allow the court to characterize Toton's representation as incompetent. Indeed, the record is clear that defendant agreed to the guilt phase submission on the basis of the preliminary hearing transcripts even though factual issues remained in the case. Although the *Williams* court had found "no plain error" prior to learning of the disciplinary action pending against counsel, once the court became aware of the disciplinary matter, it lost confidence that counsel's "decision not to make the motion to suppress [certain evidence] or to take other action on his client's behalf as professional misjudgments made with full knowledge of the applicable law and the facts." (*Id.*, at p. 143.)

By contrast, defendant herein does not assert that Toton's pending discipline prejudiced his case. The record would not support such an argument. Toton vigorously cross-examined prosecution witnesses at the preliminary hearing and during the guilt phase, made several defense motions, including one for appointed assistant counsel, which was granted, and motions for pretrial discovery, severance and additional motions that indicated he was vigorously representing his client. In addition, Toton made a comprehensive closing argument at the guilt phase. Thus, there is no indication on the record that counsel's representation was anything less than competent, and defendant fails to persuade us that counsel's representation was ineffective solely on the basis of the disciplinary action pending against him.

c. *State Constitutional Claim*

Defendant next asserts that even if we find no federal constitutional violation, he was denied his right to effective assistance of counsel under article I, section 15 of the California Constitution which states that a "defendant in a criminal case has the right . . . to have the assistance of counsel for the defendant's defense. . . ." Defendant relies on our decision in *In re Johnson* (1992) 1 Cal.4th 689 [4 Cal.Rptr.2d 170, 822 P.2d 1317] (hereafter *Johnson*) to support his argument that Toton was unfit to represent him during his capital trial.

In *Johnson,* the defendant was convicted in July 1989 of selling cocaine in violation of Health and Safety Code section 11352. (*Johnson, supra,* 1 Cal.4th at p. 694.) Unknown to the defendant, his counsel had been suspended from the practice of law prior to the representation pursuant to Business and Professions Code section 6102, following a conviction under Penal Code section 288, subdivision (a) (committing a lewd or lascivious act against a child using force or fear). In May 1989, while State Bar disciplinary proceedings were pending against counsel, he resigned. We accepted the resignation in September 1989. (*Johnson, supra,* 1 Cal.4th at p. 694.)

Although we refused to "presume that a suspended attorney lacks professional competence" (1 Cal.4th at p. 699), we nonetheless reversed the Court of Appeal judgment denying habeas corpus relief. We held that representation by one who has resigned from the State Bar denies effective counsel, and observed: "Representation by a person who has never been admitted to the practice of law or has fraudulently procured admission denies a defendant his rights under article I, section 15, as a matter of law. So too does representation by a person who, although formerly licensed, has resigned from the State Bar. The court will not examine the quality of the representation in such cases since an essential element of the constitutional right to counsel is counsel's status as a member of the State Bar." (*Id.,* at p. 701, fn. omitted.) Thus, we held, once an attorney resigns from the State Bar with charges pending, and is immediately transferred to inactive status, that attorney, for all purposes, is no longer considered a member of the bar and is not licensed to practice law. Such an attorney's representation of a defendant, therefore, violates article I, section 15, and denies the defendant effective assistance of counsel. (1 Cal.4th at p. 701.)

In reversing Johnson's conviction on ineffective assistance grounds, however, we emphasized that mere suspension of an attorney from practice under Business and Professions Code section 6102 upon conviction of any felony or other offense involving moral turpitude does not alone create a presumption of incompetence or deprive the defendant of his right to counsel under article I, section 15. (*Johnson, supra,* 1 Cal.4th at p. 699.) Indeed, we observed that even a suspension of an attorney pursuant to section 6102 does not establish, as a matter of law, that the attorney is unfit to practice law, and "a conclusion that an attorney who has committed an offense of moral turpitude is unfit to practice law is not necessarily a judgment on the attorney's professional competence." (*Johnson, supra,* 1 Cal.4th at p. 699.)

We have not previously addressed whether, as in this case, disciplinary proceedings that are pending during an attorney's representation of a criminal defendant render the assistance of counsel ineffective when there is no

suspension of the attorney or placement on inactive status. But under *Johnson*'s reasoning, we can conclude that the fact disciplinary proceedings were pending against counsel Toton did not *automatically* render Toton's performance inadequate or prejudice defendant's right to effective counsel. (See also *Strickland, supra,* 466 U.S. at p. 696 [80 L.Ed.2d at p. 699].) As the People observe, "While representing [defendant], defense counsel Toton was not even subject to suspension under Business and Professions Code section 6102 because he had not been convicted of any crime. In an attempt to establish the denial of his right to counsel, [defendant] equates defense counsel Toton's alleged failure to challenge the State Bar proceedings with the attorney's resignation from the State Bar in *Johnson.*" In fact, unlike the attorney in *Johnson,* Toton was a member of the State Bar at all times during his representation of defendant. " 'Erring morally or by a breach of professional ethics does not necessarily indicate a lack of knowledge of the law.' " (*Johnson, supra,* 1 Cal.4th at p. 699.) We simply are not persuaded that Toton's unrelated disciplinary problems in any way influenced his representation of defendant or otherwise rendered him unfit as a matter of law. (See *Johnson, supra,* 1 Cal.4th at pp. 699-702.)

### d. *Alleged Conflict of Interest*

Defendant's claim that Toton's disciplinary proceedings rendered him incompetent " 'is no more persuasive if considered under the rubric of conflict of interest. A criminal defendant's right to effective assistance of counsel, guaranteed by both the state and federal Constitutions, includes the right to representation free from conflicts of interest. (*Wood* v. *Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097]; *People* v. *Jones* (1991) 53 Cal.3d 1115, 1134 [282 Cal.Rptr. 465, 811 P.2d 757].) To establish a violation of the right to unconflicted counsel under the federal Constitution, 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' [Citation.] To establish a violation of the same right under our state Constitution, a defendant need only show that the record supports an 'informed speculation' that counsel's representation of the defendant was adversely affected by the claimed conflict of interest.' " (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1009 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

In *People* v. *Jones* (1991) 53 Cal.3d 1115 [282 Cal.Rptr. 465, 811 P.2d 757] (hereafter *Jones*) we also observed that "[c]onflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.' " (*Id.,* at p. 1134, quoting *People* v. *Bonin* (1989) 47 Cal.3d 808, 853 [254 Cal.Rptr. 298, 765 P.2d 460] [hereafter *Bonin*].)

Defendant contends that the alleged conflict of interest between himself and Toton was caused by Toton's "own interest" in expediting the trial prior to his disbarment, to the defendant's prejudice. Defendant asserts that the fact of the pending disciplinary action gave Toton a strong incentive to finish defendant's case as quickly as possible, implying that Toton's desire to end the case led to a constitutionally deficient performance.

Based on the appellate record, we are not persuaded by defendant's arguments. As we have observed, the record shows that Toton was not disbarred until *eight months after* the court and defendant learned of the proceedings against him, and one month after completion of the penalty phase of defendant's trial. There is no indication that the disciplinary proceedings influenced the pace of Toton's representation, and, indeed, there is substantial evidence on record that would support the opposite conclusion.

First and foremost, it was Toton who advised defendant not to plead guilty and instead to submit the guilt and special circumstance issues on the basis of the preliminary hearing transcripts. This alternative to a guilty plea allowed counsel to contest the People's case, present various defense motions to the court, and generally make a stronger case for defendant than would have been available following a guilty plea. Thus, counsel Toton actually prolonged the trial notwithstanding defendant's desire to proceed directly to the penalty phase.

Moreover, even if we were to perceive either an actual conflict of interest, as required by federal law, or to conclude the record supports an "informed speculation" of a conflict as required under our state Constitution, defendant intentionally and knowingly waived any conflict on the record. (*Ante*, at pp. 38-39.)

In addition, defense counsel Frank informed the court he was satisfied that Toton's pending discipline "had nothing to do with the waiver of the jury trial." At a later in camera hearing attended by defense counsel Frank, defendant admitted that, in partially submitting his case, it was his desire to waive jury trial "under any circumstances," that he had had a "lengthy discussion" regarding his rights with defense counsel Frank, and that he wanted to maintain the status quo.

The fact that defendant did not discuss Toton's pending discipline with him does not assist defendant's conflict claim. Here, defendant asserts that his "discussion with Frank could not substitute for a discussion with Toton. By his own admission, Frank knew nothing about his cocounsel's impending

[discipline] until the news appeared on the front page of the Bakersfield newspaper . . . . Toton hid this important fact from his own assistant counsel until the news became public. Nothing in the record indicates that Frank knew any more about the [discipline] than did the readers of the Bakersfield Californian. Frank simply was not able to speak for Toton in discussing the impact of the [disciplinary proceedings] on the future conduct of the defense [nor was] Frank in [a] position to discuss with [defendant] how the [disciplinary] proceedings already might have affected Toton's guilt phase strategy." Defendant fails to show, however, how Toton's assurances or perspective would have assisted him in determining whether he wanted to waive the conflict, or how Toton would have provided him with a better explanation than that given by the court about the potential drawbacks of Toton's continued representation.

Defendant next asserts that the trial court failed in its duty to ensure that he knowingly and intelligently waived any conflict with counsel. ▬▬ "When a trial court knows or should know that defense counsel has a possible conflict of interest with his client, it must inquire into the matter [citations] and act in response to what its inquiry discovers [citation]." (*Jones, supra,* 53 Cal.3d at p. 1136.) If the court determines that a waiver of a conflict is necessary, it must satisfy itself that " '(1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right.' " (*Bonin, supra,* 47 Cal.3d at p. 837, quoting *People* v. *Mroczko* (1983) 35 Cal.3d 86, 110 [197 Cal.Rptr. 52, 672 P.2d 835].) A trial court's failure to inquire into the conflict or to adequately respond to its inquiry amounts to reversible error if the defendant can show "that an actual conflict of interest existed and that that conflict adversely affected counsel's performance." (*Bonin, supra,* 47 Cal.3d at pp. 837-838; cf. *Strickland, supra,* 466 U.S. at p. 692 [80 L.Ed.2d at pp. 696-697].)

▬▬ Defendant asserts that the trial court "never asked [defendant] in clear, unambiguous language whether he was willing to waive his right to unimpaired counsel." He also complains of the court's failure to "determine whether [Toton's] alleged misuse of client funds might indicate that Toton had financial difficulties which might affect his work or handling of funds in [defendant's] case, [nor did the court] ask Toton about the timetable of state bar proceedings [or ask] how the bar proceeding might affect, or might have affected, Toton's conduct of [defendant's] case."

In deciding whether a defendant understands the nature of a possible conflict of interest with counsel, the trial court need not explore each

foreseeable conflict and consequence. (*Jones, supra*, 53 Cal.3d at p. 1137.) Nor does a defendant's waiver of conflict-free counsel extend merely to matters discussed on the record. (*Ibid.*) As we observed in *Maxwell* v. *Superior* Court (1982) 30 Cal.3d 606, 621 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333], "[r]ules that are that strict seem neither necessary nor workable." (See also *People* v. *Clark* (1992) 3 Cal.4th 41, 140 [10 Cal.Rptr.2d 554, 833 P.2d 561] [waiver found adequate even though all conceivable ramifications of conflict not explained].) Thus, looking at the whole record, we must determine whether defendant was aware of the potential drawbacks and possible consequences of retaining Toton, and whether he understood his right to conflict-free counsel and knowingly waived that right.

It is clear that the record belies defendant's argument. The court's response to the asserted conflict of interest was appropriate under the circumstances; it was immediate and informed petitioner of his rights under the facts. As the record indicates, the court discussed the conflict with the parties, was careful to ensure defendant was aware that a conflict existed, and confirmed that his waiver of the conflict was voluntary and knowing. (*Ante*, at pp. 37-40.) Defendant even declined the court's invitation to make a motion for mistrial, emphasizing that he was satisfied with the state of the record. Thus, in light of all the circumstances, we conclude the court gave defendant an opportunity to declare a mistrial, to relieve counsel, and to voice his objections on the record. In our view, the trial court conducted an adequate inquiry into the conflict, and we are satisfied that defendant's waiver was knowing and voluntary. (See *Jones, supra*, 53 Cal.3d at pp. 1137-1138.)

### 5. *Reporter Immunity Under the California Shield Law*

#### a. *Background*

As observed in the statement of facts (*ante*, at p. 21), following his arrest, defendant was interviewed by Michael Trihey, a reporter for the Bakersfield Californian. The newspaper published an article based on Trihey's five interviews with defendant. The article, entitled *Accused Asks for Own Death, System Says No*, was published on April 25, 1988. The article observed that "Ted Sanchez says he's a murderer, a triple murderer," and that all three victims "were killed for their social security checks." The article also revealed defendant's feelings of guilt: "I am not an innocent man. If a man feels guilty he should be allowed to plead guilty," and revealed that he wanted to die in the gas chamber: "I want to do the right thing. I should go

straight to the gas chamber. I don't need no appeals. I deserve to die." In addition, the article noted that defendant reenacted the crimes for Trihey by "raising one arm, covered with the tattoos he got in prison, to show how a fatal knife wound was inflicted." Earlier articles based on the same interviews, including one published on February 12, 1988, reported that defendant "did not actually kill" either Juan or Juanita but felt "he deserves to die because he was present when the slaying happened, because he helped the killers and because he didn't intervene to save the couple, who had been kind to him for years." The same article also quoted defendant as telling Trihey that, " 'Joey grabbed a knife and started going at his dad' " and, " 'that's when Reyes stepped in' and began clubbing [Juan] Bocanegra." The article also stated that defendant told Trihey "they all had been smoking PCP" before committing the crimes. Defendant was quoted as admitting that at the time of the Bocanegra murders, " 'I was scared . . . . It was just that I felt fear, and I didn't know how to respond to it. It could have been mixed emotions because of the PCP taking me . . . . I've been through a lot. I have done a lot of bad things. You know, I am no angel. [¶] One thing, I have not murdered nobody. I've done a lot of other things but I haven't went that far yet.' " Finally, the article quoted defendant as asserting he "didn't want to talk about the Tatman case other than to say, 'I'm not guilty of that.' "

During the guilt phase the prosecution subpoenaed Trihey as a witness to testify as to the events he reported in his April 25, 1988, article. Trihey and the Bakersfield Californian filed a motion to quash the subpoena and for a protective order against the disclosure of unpublished information obtained from defendant, on the ground that the information sought was protected by the California Shield Law (hereafter shield law). (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.)[2] After the prosecutor assured the court she intended to limit questioning of Trihey to published statements only, the court indicated that it would rule on a "question by question basis." When

---

[2]California Constution, article I, section 2, subdivision (b), states in pertinent part: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through

the prosecutor called Trihey to testify, Toton objected. The court allowed Trihey to testify, subject to a motion to strike.

Trihey then testified that he interviewed defendant five times, and that defendant told him he was "a triple murderer" and that "all three [victims] were killed for their social security checks." When Toton asked Trihey if he had made any tape recordings of any interviews with defendant, Trihey's counsel objected on the ground that the question violated the shield law. The court then discontinued the cross-examination pending the submission of defense counsel's points and authorities.

The next day, defendant argued that application of the shield law to protect unpublished information in Trihey's possession would deny him his Fifth Amendment right against self-incrimination, and his Sixth Amendment rights to confrontation and to the effective assistance of counsel, as well as his statutory right to introduce his entire conversation with Trihey. (Evid. Code, § 356 [when part of act, declaration, conversation, or writing is given in evidence by one party, the whole may be inquired into by adverse party].) Defense counsel moved the court either to strike Trihey's testimony or to order Trihey to furnish defendant with all unpublished information regarding the interviews. The court made the following ruling:

"THE COURT: I am going to rule that you haven't gotten over the hurdle of [*Hammarley* v. *Superior Court* (1979) 89 Cal.App.3d 388 (153 Cal.Rptr. 608)] and [*Hallissy* v. *Superior Court* (1988) 200 Cal.App.3d 1038 (248 Cal.Rptr. 635)] at this point, and that you may cross-examine Mr. Trihey concerning any of the printed material we have, either this current article or the one before.

"I am also going to tell you that the court's ruling at this point is without prejudice and that the court does not intend to make a ruling in this case."

Thereafter, the court clarified its ruling in the following colloquy:

"MR. TOTON: Number one, I can cross-examine Mr. Trihey on any published article.

"THE COURT: Absolutely.

---

a medium of communication, whether or not published information based upon or related to such material has been disseminated."

Evidence Code section 1070 contains substantially similar language. (See *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 796 [268 Cal.Rptr. 753, 789 P.2d 934] [hereafter *Delaney*].)

"Mr. Toton: And the contents of any published article.

"The Court: Absolutely.

"Mr. Toton: I would be prohibited from inquiring behind the published material?

"The Court: At this point.

"Mr. Toton: I am not clear as to which [Hammarley], [Hallissy] prong is lacking.

"The Court: Well, I don't think there is any, right now there is no issue that somehow Mr. Trihey is lying and can be impeached and so forth.

"That penultimate paragraph [in Hallissy] that Mr. Werdel called to my attention is pretty strong language.

"Mr. Toton: That is the one that starts off, [A]rguably?

"The Court: Right.

"Mr. Toton: So that if I understand, it's the second prong of [the Hammarley test relied on by the Hallissy court] which is lacking; is that correct, your Honor?

"The Court: Right."

Defendant now claims the trial court erred in limiting the scope of Trihey's testimony and renews his trial court objections.

b. *Newsperson's Shield Law*

In ruling that defendant had failed to meet the second prong of the *Hammarley* test, the court was referring to *Hammarley*'s construction of the shield law under Evidence Code section 1070, and its development of a four-pronged test that assisted the court in determining whether the statute should protect a newsperson from having to reveal undisclosed corroborating sources pertaining to the newsperson's interviews with a named individual who was the prosecution's principal witness in a murder case. (*Hammarley*

v. *Superior Court* (1979) 89 Cal.App.3d 388, 392-394 [153 Cal.Rptr. 608] [hereafter *Hammarley*].)

 The *Hammarley* court reviewed the legislative history and intent of the shield law. The court observed, "The 'unpublished information' provisions of [Evidence Code] section 1070 were added by amendment in 1974. Prior to that time, the statutory privilege expressly encompassed only source disclosure." (*Hammarley, supra*, 89 Cal.App.3d at p. 396, fn. omitted.) The court held that "the statutory privilege protecting unpublished information is not limited to material which might lead to the disclosure of a [newsperson's] confidential sources, but encompasses all information acquired by the [newsperson] in the course of his professional activities which he has not disseminated to the public." (*Id.*, at pp. 397-398.)

The *Hammarley* court then stated its test for determining whether a defendant has met his burden in overcoming the statutory protection. "Faced with a claim of privilege, the burden is on the party seeking to avoid the privilege competently to demonstrate not only that the evidence sought is relevant and necessary to his case, but that it is not available from a source less intrusive upon the privilege. Moreover, as with any attempt to discover evidence subject to a claim of privilege, a defendant must show a reasonable possibility that the evidence sought might result in his exoneration." (89 Cal.App.3d at p. 399.)

Nine years later, in *Hallissy* v. *Superior Court* (1988) 200 Cal.App.3d 1038 [248 Cal.Rptr. 635] (hereafter *Hallissy*), the court used the *Hammarley* test to grant a newsperson immunity from revealing unpublished sources. A brief review of *Hallissy*'s facts is instructive.

A defendant was charged with three counts of first degree murder (§§ 187, 198), and with the multiple-murder and murder-for-financial-gain special circumstances. (§ 190.2, subd. (a)(1) & (3).) Prior to the preliminary hearing, the defendant was interviewed by a reporter for the Contra Costa Times. (*Hallissy, supra*, 200 Cal.App.3d at p. 1041.) Information gathered during the interview was published in the paper in an article entitled, *I Killed Many for Pay*. (*Ibid.*) Following publication of the article, the prosecutor amended the complaint to allege the murder-for-financial-gain special circumstance. (*Ibid.*) The defendant then subpoenaed Hallissy, the reporter, to appear at the preliminary hearing with the unpublished notes of the interview. (*Ibid.*) The trial court granted Hallissy's motion to quash the subpoena on the ground that the unpublished information was protected by the First Amendment of the United States Constitution, and by article I, section 2, subdivision (b), of the state Constitution.

In affirming the trial court, the Court of Appeal held that the defendant had failed to meet the second prong of *Hammarley*. (*Hallissy*, *supra*, 200 Cal.App.3d at p. 1046.) The court observed, "Arguably [defendant] approaches an adequate showing of relevancy: he wishes to attack his own credibility by using inconsistent statements that he may have made to the reporter during the interview. But he has made no attempt to demonstrate that this particular item of evidence, if it exists, is necessary to his case, the second prong of *Hammarley*." (*Hallissy*, *supra*, 200 Cal.App.3d at p. 1046.)

During the past five years, we have had the opportunity to review application of the shield law in the context of criminal cases. (See e.g., *Delaney*, *supra*, 50 Cal.3d 785.) While using the *Hammarley* and *Hallissy* cases as a benchmark from which to develop our own test for determining whether the shield law should protect a reporter under the particular facts of a case, we disapproved those cases to the extent they held "that a criminal defendant must in every case show the lack of an alternative source regardless of the circumstances." (*Delaney*, *supra*, 50 Cal.3d at p. 813, fn. 29.) We noted, however, that both *Hammarley* and *Hallissy* were consistent with the test we adopted in *Delaney* "[a]s to the threshold showing required." (*Delaney*, *supra*, 50 Cal.3d at p. 808, fn. 22.)

In fashioning its test for determining whether the shield law should apply to a particular set of facts, the *Delaney* court held that the law protects a newsperson from being held in contempt of court for refusal to disclose either unpublished information or the source of the reporter's information, whether published or unpublished. (*Delaney*, *supra*, 50 Cal.3d at pp. 796-797; cf. *People* v. *Cooper* (1991) 53 Cal.3d 771, 820-821 [281 Cal.Rptr. 90, 809 P.2d 865] [hereafter *Cooper*].) ▮ Nonetheless, the *Delaney* court recognized that "a newsperson's protection under the shield law must yield to a criminal defendant's constitutional right to a fair trial when the newsperson's refusal to disclose information would unduly infringe on that right." (*Delaney*, *supra*, 50 Cal.3d at p. 793.) "In order to compel disclosure of information covered by the shield law, the defendant must make a threshold showing of a reasonable possibility that the information will materially assist his defense. The showing need not be detailed or specific, but it must rest on more than mere speculation. [Citation.] If the threshold showing is made, the court then balances various factors in determining whether to compel disclosure of the information. [Citation.]" (*Cooper*, *supra*, 53 Cal.3d at p. 820, paraphrasing *Delaney*, *supra*, 50 Cal.3d at pp. 809-813.)

The trial court's ruling in this case predated both *Delaney*, *supra*, 50 Cal.3d 785, and *Cooper*, *supra*, 53 Cal.3d 771, but that fact does not bear on our decision. Indeed, defendant concedes *Delaney* states the applicable standard.

Defendant makes several arguments against application of shield law immunity in this case: (1) Trihey's assertion of the privilege was premature because the court had not adjudged him in contempt of court before he invoked immunity; (2) Trihey failed to lay the proper foundation for invoking the immunity; (3) even assuming immunity was properly invoked, defendant met *Delaney*'s threshold test for defeating a claim for immunity; (4) application of immunity in this case was prejudicial and denied defendant his federal constitutional rights to confrontation and discovery under the Sixth and Fourteenth Amendments (see, e.g., *Davis* v. *Alaska* (1974) 415 U.S. 308, 315 [39 L.Ed.2d 347, 353, 94 S.Ct. 1105]; *Lee* v. *Illinois* (1986) 476 U.S. 530, 540 [90 L.Ed.2d 514, 525-526, 106 S.Ct. 2056] [right to confront and cross-examine witnesses is functional right that promotes reliability in criminal trials]; *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431] [right to confront and cross-examine witnesses includes right to adequate cross-examination]; *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39, 56 [94 L.Ed.2d 40, 56-57, 107 S.Ct. 989] [criminal defendants have right to government's assistance in compelling attendance of favorable witnesses]); and (5) Toton's failure to cross-examine Trihey on alleged inconsistent statements contained in the article deprived defendant of effective assistance of counsel. On this record, we are not persuaded by defendant's contentions.

 First, with respect to his assertion that the timing of Trihey's claim of immunity should bar application of the shield law, defendant relies on *New York Times Co.* v. *Superior Court* (1990) 51 Cal.3d 453 [273 Cal.Rptr. 98, 796 P.2d 811] (hereafter *New York Times*), in which we held that a precontempt petition for extraordinary relief under the shield law was prematurely filed. *New York Times,* however, does not assist defendant, for it was based on the reasoning that precontempt relief "would deprive trial courts of the opportunity to decide in the first instance whether the shield law applies to the facts of a case." (*Id.* at p. 459.)

In *New York Times*, the court was asked to decide whether, in a products liability action against a car manufacturer for damages arising out of an automobile accident, the manufacturer could subpoena the unpublished photographs of the accident taken by a newspaper reporter. After the publisher invoked the shield law immunity and refused to comply with the manufacturer's subpoena, the trial court ordered the production of the photographs. Before being adjudged in contempt, the publisher petitioned the Court of Appeal for an extraordinary writ and stay of the court's order. (51 Cal.3d at p. 457.) The Court of Appeal issued a writ of mandate ordering the trial court to deny the manufacturer's motion to compel, finding that, unlike

application of immunity in a criminal proceeding, in which we have held that the defendant may overcome its application by showing that the immunity would deprive him of a fair trial under the federal constitution, the shield law provides " 'absolute protection to nonparty journalists in civil litigation from being compelled to disclose unpublished information.' " (*Ibid.*)

Although we granted the publisher relief in *New York Times*, we observed that because the shield law provides an immunity from contempt, and not a privilege, the writ petition was premature. (51 Cal.3d at pp. 458-459.) This finding of prematurity was based on the practical concern that precontempt relief would frustrate the trial court's ability to determine whether the immunity should apply in the first instance. (*Id.* at p. 459.) We reasoned: "Premature interference in trial court proceedings would deprive reviewing courts of adequate factual records for making this determination. Premature relief would also allow newspersons to avoid the responsibility of choosing between disclosing information or being held in contempt. A newsperson would have no incentive to make that choice until after a decision by a reviewing court. The result would be an increased burden on reviewing courts." (*Id.*, at pp. 459-460.)

The above reasoning, while clearly based on practical grounds, does not foreclose a claim of immunity in the trial court by the nonparty witness during cross-examination. By invoking immunity while on the witness stand, the newsperson is making the choice, discussed in *New York Times*, between disclosing the information he or she believes falls under the ambit of the shield law, or being held in contempt. (51 Cal.3d at p. 460.) That was the choice properly made by Trihey and the Bakersfield Californian when raising shield law immunity during cross-examination.

Defendant's claim that Trihey failed to lay a proper foundation for raising the shield law is equally unavailing. First, defendant failed to object on this ground. Accordingly, he has waived the claim on appeal. (Evid. Code, § 353, subd. (a).) Had he made the proper objection, however, his claim would fail on the merits.

We held in *Delaney*, *supra*, 50 Cal.3d at page 805, that under article I, section 2, subdivision (b) of the state Constitution, a newsperson claiming shield law protection "must show that he is one of the types of persons enumerated in the law, that the information was 'obtained or prepared in gathering, receiving or processing of information for communication to the public,' and that the information has not been 'disseminated to the public by

the person from whom disclosure is sought.' " (*Delaney, supra,* 50 Cal.3d at p. 805, fn.17, quoting Cal. Const., art. I, § 2, subd. (b).) Once that showing is made, the burden shifts to the party opposing the immunity to show "a *reasonable possibility* the information will materially assist his defense." (50 Cal.3d at p. 808, italics in original.)

Trihey met his foundational requirements. In support of his motion to quash the People's subpoena, he filed a declaration stating that he was a news reporter employed by the Bakersfield Californian Newspaper, that his sources for the February 12, 1988, and April 25, 1988, articles on defendant "[were] the source or sources of some information, procured while so connected or employed, for publication in the newspaper." Trihey also declared that the information gathered for the stories "[was] unpublished and [had] not been disseminated to the public . . . except for the specific information published in said news article," and that "[a]ll such unpublished information was obtained or prepared in the gathering, receiving or processing of information for communication to the public." Defendant has provided no evidence that would contradict Trihey's declaration and, in fact, concedes the subject notes and tapes were "unpublished information" within the meaning of the shield law.[3]

Once Trihey met the shield law requirements, defendant was required to show that nondisclosure would deprive him of his federal constitutional right to a fair trial. (*Delaney, supra,* 50 Cal.3d at p. 805.) As observed, *ante,* this page, in order to meet this burden, defendant had to make a threshold showing that it was *reasonably possible* the unpublished information he sought was necessary to his defense. (*Delaney, supra,* 50 Cal.3d at p. 808.)

Although *Delaney* did not and could not specify what evidence would meet its threshold test, the court did observe that the defendant need not prove evidence he sought to discover would lead to his exoneration and that "the defendant's showing need not be detailed or specific, but it must rest on more than mere speculation." (*Delaney, supra,* 50 Cal.3d at p. 809.) Some examples the court provided are instructive: "[E]vidence may establish an 'imperfect defense,' a lesser included offense, a lesser related offense, or a lesser degree of the same crime; impeach the credibility of a prosecution

---

[3]Because defendant litigated the question on the assumption that the alleged notes and tapes (at least those pertaining to the interviews with Trihey) were unpublished information within the meaning of the shield law, we do not address the issue whether the fact that defendant himself was the source of some of the information rendered it outside the protection of the shield law.

witness; or, as in capital cases, establish mitigating circumstances relevant to the penalty determination. A criminal defendant's constitutional right to a fair trial includes these aspects of his defense." (*Ibid.*, fn. omitted.)

■■■■ In attempting to meet his burden, defendant attacks his own credibility by claiming he made inconsistent statements during the course of the interviews that would have exposed his confused state of mind at the time the interviews took place. He asserts his alleged unpublished statements also could have been used to impeach Trihey's testimony that defendant had told him he was a "triple murderer" and that "all three were killed for their social security checks." But defendant never shows how the information he sought would materially assist his defense, or how it differed in content from the testimony and published information available for cross-examination, including defendant's statements that he was scared, that he had taken phencyclidine (PCP), and that he had not murdered anyone. Defendant simply asserts that he "needed discovery of, and cross-examination about, the unpublished records of the interviews to impeach Trihey's testimony. Unlike other statements attributed to [defendant] in the April 25th article, Trihey's 'triple murderer' assertion was not a direct quotation. Rather, it was a conclusion drawn by Trihey. Trihey's unpublished material might have shown that his 'triple murder' testimony was his own interpretation of [defendant's] account, not an actual admission. Moreover, discovery and cross-examination might have proven that Trihey's conclusion was not supported by the interviews. The tapes might have shown that [defendant] never said he was a 'triple murderer' or a 'triple killer'; that he did not hit either Juan or Juanita; that he did nothing to aid or abet Joey; that he did not intend that either Juan or Juanita be killed; that he tried to stop Joey from killing his parents; or that he feels guilty because he failed to prevent the homicides. Any of these possibilities would have bolstered [defendant's] insufficiency of the evidence argument."

The alleged evidence defendant claims would have materially assisted his defense consists of nothing more than self-serving statements that a court could reasonably conclude were either too speculative to assist defendant or would harm, rather than materially assist, the defense. Indeed, this case is similar to *Hallisy, supra,* 200 Cal.App.3d at page 1041, in which the court rejected the defendant's attempt to attack his own credibility by subpoenaing a reporter's unpublished interview notes. Based on this record, and under the more recent *Delaney* threshold test, we find that defendant has failed to make the threshold showing that publication of alleged unpublished interview

information possessed by Trihey would have materially assisted the defense and defeated Trihey's claim of immunity under the shield law.[4]

In addition, for the same reasons noted above, we reject defendant's claim that he was denied his right to confront and cross-examine Trihey and to discover and present evidence under the Sixth and Fourteenth Amendments. The record shows the court rejected Trihey's statements as proof that defendant killed the victims for their Social Security checks. Moreover, the court found untrue the special circumstance allegations that the murders of Juan and Juanita Bocanegra were committed during a robbery and found defendant not guilty of the robbery in connection with that crime. Thus, it appears the court afforded little weight to Trihey's testimony, and defendant was not denied his federal constitutional right to a fair trial simply because the court allowed the testimony to be introduced.

▇▇▇ In a related argument based on independent state grounds, defendant claims that application of the shield law denied him his right "to the complete statements he made to Trihey." Defendant asserts the unpublished statements should have been provided the defense under Evidence Code section 356, allowing him to inquire into the entire conversation with Trihey. Defendant fails to acknowledge, however, that "section 356 evidence" is subject to the immunity provided under the shield law. (1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 319, p. 292, and cases cited.) In addition, defendant fails to show how the unpublished statements he alleged he made to Trihey would have placed Trihey's testimony in its proper context, or that the information sought had some connection with Trihey's testimony. (See *People* v. *Zapien* (1993) 4 Cal.4th 929, 959 [17 Cal.Rptr.2d 122, 846 P.2d 704]; see also *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1174 [259 Cal.Rptr. 701, 774 P.2d 730].)

▇▇▇ Finally, we reject defendant's assertion that counsel's failure to cross-examine Trihey before closing argument denied him the effective assistance of counsel under article I, section 15 of the California Constitution, and the Sixth and Fourteenth Amendments to the federal Constitution. In order to succeed in his claim, "defendant must show (1) deficient performance under an objective standard of professional reasonableness and (2)

---

[4]Because we conclude that defendant has failed to meet the threshold showing required by *Delaney, supra,* 50 Cal.3d at pages 808-809, we do not discuss his alternative argument that he has satisfied the *Delaney* balancing factors for determining whether a defendant is entitled to a newsperson's unpublished information. These factors include a consideration of "whether the information is confidential or sensitive, the interests sought to be protected by the shield law . . . the importance of the information to the criminal defendant," and, depending on the particular facts, whether there is an alternative source for the unpublished information. (*Id.*, at p. 813.)

prejudice under a test of reasonable probability of an adverse effect on the outcome." (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40] [hereafter *Berryman*]; cf. *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing state and federal right to effective assistance of counsel].) Defendant does not satisfy either prong of the foregoing test.

As discussed, Toton convinced the court during his closing argument that Trihey's testimony should not be given substantial weight; his decision not to cross-examine Trihey as to the contents of the published material was sound strategy, given the nature of defendant's alleged contradictory statements. Defendant does not establish that cross-examination would have revealed any new information, or that any additional information about the interviews would have influenced the court's judgment. Hence, we cannot find counsel's failure to cross-examination Trihey to be deficient. In any event, given the fact that the court dismissed the robbery charges against defendant, and found not true the robbery-murder special-circumstance allegation, we discern no prejudice to defendant based on counsel's performance. (*Berryman*, *supra*, 6 Cal.4th at p. 1082.)

### 6. *Alleged Prosecutorial Misconduct*

 Defendant contends that Prosecutor Ryals committed prejudicial misconduct in her guilt phase closing argument. He claims that Ryals's argument that there was no evidence anyone other than Joey Bocanegra and defendant committed the murders was knowingly false. As evidence of the prosecutor's bad faith, defendant cites allegedly contrary statements she made to the court during subsequent pretrial hearings in the prosecution of Reyes. Because the asserted evidence of misconduct is not within the appellate record or our judicial notice, we do not reach the merits of defendant's claim on appeal. To the extent defendant has a valid claim of prosecutorial misconduct based on events occurring after his trial, and therefore not reflected in the appellate record, his claim must be presented by petition for writ of habeas corpus rather than by appeal.[5]

---

[5]Defendant has filed a motion for judicial notice of (1) the records filed in this court and the California State Bar Court in In re Toton (No. 85-0-15827), (2) the record and exhibits filed in the Court of Appeal in *Reyes* v. *Superior Court*, (3) the guilty plea and sentencing records filed in the Kern County Superior Court in People v. Reyes (Super. Ct. Kern County, No. 34638-C), and (4) the record of dismissal of charges filed in the Kern County Superior Court in People v. Bocanegra (Super. Ct. Kern County). (Evid. Code, § 452, subd. (d).) We deny the request as to the Reyes records because it would improperly augment the appellate record. We

### 7. *Cumulative Guilt Phase Error*

Defendant contends his conviction should be reversed because of the cumulative effect of the alleged guilt phase errors. He relies on the California Constitution, article I, section 15, and the Sixth and Fourteenth Amendments to the United States Constitution.

Contrary to defendant's contention, however, he has not sustained any of his claims of error. Accordingly, we find no cumulative deficiency in the guilt phase proceedings to support reversal. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 1006 [2 Cal.Rptr.2d 112, 820 P.2d 214] [hereafter *Ashmus*].)

### B. *Penalty Phase*

### 1. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law is unconstitutional under the United States and California Constitutions because it fails to narrow the class of death-eligible murderers and thus renders "the overwhelming majority of intentional first degree murderers" death eligible. Defendant cites statistics of all first degree murder convictions in which a defendant was found death eligible, and concludes: "The vice of the California scheme is not that any one of the special circumstances taken alone is unconstitutional—each arguably identifies a subclass of all first degree murders more deserving of the death penalty than other members of the class. The vice is that, taken together, the special circumstances cover virtually all first degree murders (and a substantial majority of all murders), and, thus, they perform no narrowing function at all." Principally, defendant relies on Justice Blackman's dissent in *Tuilaepa* v. *California* (1994) 512 U.S. __, __ [129 L.Ed.2d 750, 767-774, 114 S.Ct. 2630], in which he stated: "By creating nearly 20 such special circumstances, California creates an extraordinarily large death pool." (*Id.* at p. __ [129 L.Ed.2d at pp. 773-774] (dis. opn. of Blackman, J.).)

We have repeatedly considered and rejected this identical claim beginning with our decision in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 770-779 [230 Cal.Rptr. 667, 726 P.2d 113]. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 154-156 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Moreover, in *Tuilaepa* v.

deny the request as to the remaining documents on the ground that reference to them is unnecessary to our discussion of the issues raised by defendant. (*Turner, supra,* 8 Cal.4th at pp. 193-194.)

*California, supra,* and in a number of previous cases, the high court has recognized that "the proper degree of definition" of death-eligibility factors "is not susceptible of mathematical precision"; the court has confirmed that our death penalty law avoids constitutional impediments because it is not unnecessarily vague, it suitably narrows the class of death-eligible persons, and provides for an individualized penalty determination. (*Tuilaepa* v. *California, supra,* 512 U.S. at pp. \_\_-\_\_ [129 L.Ed. at pp. 761-764] and cases cited.) Defendant's argument fails to convince us to revisit the issue. (*Ashmus, supra,* 54 Cal.3d at pp. 1009-1010.)

### 2. Adequacy of Court-conducted Voir Dire

 Defendant asserts that the trial court abused its discretion in the jury selection process because its voir dire questioning omitted the July 26, 1988, newspaper article in the Bakersfield Californian that focused on the disbarment proceedings pending against defense counsel Toton. The article also mentioned that Toton had been appointed to represent "admitted triple killer Ted Sanchez" and that "in an unusual move, [Toton] waived a jury trial this month, cutting out a jury-selection process that could have taken months."

Even though cocounsel Frank conducted the penalty phase defense, defendant complains that the court's failure to question the prospective jurors specifically on the contents of the article about Toton prejudiced the jury and made it unable to render a fair and impartial verdict in violation of his right to a fair and impartial jury under the due process and jury trial provisions of the federal and state Constitutions. (U.S. Const., Amends. VI, XIV; Cal. Const. art. I, § 16.) Although defendant mentions the fact that neither defense counsel nor the district attorney questioned the jury about the article, the thrust of defendant's argument is that the trial court "did not even begin to cover a subject bearing on the impartiality of the jury," and that the lack of specific inquiry into the effect of any knowledge of Toton's pending disbarment on the potential jurors made it "impossible to conclude that [defendant's] penalty jury was fair and impartial."[6]

Defendant's argument is unconvincing. First, it is evident from the record that defendant failed to preserve his claim of improper voir dire by objecting

---

[6]Defendant also asserts, without analysis, that the failure to conduct voir dire on the contents of the article violated former Code of Civil Procedure section 1078. That section was in effect during defendant's trial, but was shortly thereafter repealed by Proposition 115 and Code of Civil Procedure section 223, which adopted the federal practice of court-conducted voir dire, allowing the attorneys to supplement the jury examination only on a showing of good cause. Code of Civil Procedure section 223 also provides that a trial court's exercise of discretion during voir dire shall not be disturbed in the absence of a miscarriage of justice. (Cal. Const, art. VI, § 13.) Former Code of Civil Procedure section 1078, which governs this

to the court's questioning during trial. (*People* v. *Viscotti* (1992) 2 Cal.4th 1, 48 [5 Cal.Rptr.2d 495, 825 P.2d 388].) On the merits, our review of the record shows the trial court's voir dire adequately insured an impartial jury, without unnecessarily exposing the jury to the very information defendant found could prejudice his case.

In *People* v. *Wash* (1993) 6 Cal.4th 215 [24 Cal.Rptr.2d 421, 861 P.2d 1107] (hereafter *Wash*) we held that although the trial court has "considerable discretion" in the voir dire process, the court must allow counsel to ask questions designed to assist counsel in the exercise of peremptory challenges. (*Id.*, at p. 253; see also *People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869].)

The trial court complied with its obligation under *Wash, supra,* 6 Cal.4th 215, to assist counsel and to ensure a fair and impartial jury by requiring the 201 prospective jurors to fill out a one-page questionnaire asking the panel members whether they had ever heard of the case, and if so, to name their source. (See *People* v. *Chaney* (1991) 234 Cal.App.3d 853, 860 [286 Cal.Rptr. 79] [information must be extracted from jurors to assess their impartiality].) Of the jurors eventually selected to serve, eight told the court they had never heard of defendant's case, were not familiar with counsel, and either did not subscribe to or did not read on a consistent basis the Bakersfield Californian. In addition, pursuant to further questioning by the court, four of these jurors indicated they did not believe everything they read in the newspaper.

Two other jurors who acknowledged they read the Bakersfield Californian observed that they had never heard of defendant's case.

Two of the twelve jurors selected had prior knowledge of defendant's case, but their voir dire responses clearly indicated that their exposure to the newspaper articles about defendant's case was limited to an awareness of the general facts and circumstances of the Bocanegra and Tatman murders. Their knowledge of the case did not include any specific information

---

case, conferred a right of counsel to a reasonable examination of jurors, but imposed on the trial court the duty to "examine the prospective jurors to select a fair and impartial jury." Because defendant is complaining that the trial court failed to ensure a fair and impartial jury, the difference in the statutory language between former Code of Civil Procedure section 1078 and Code of Civil Procedure section 223 is inconsequential. To the extent defendant is claiming that the trial judge did not select a fair and impartial penalty phase jury under former Code of Civil Procedure section 1078, his claim is rejected, there being no showing the jury was unfair or biased.

regarding Toton's pending disbarment. Thus, it appears that the trial court acted well within its discretion in proposing the general question of the jurors' knowledge of Toton's pending disbarment without unnecessarily educating the jury about that matter. The trial court's strategy thus avoided informing the jury of Toton's troubles, while assuring defendant a fair and impartial jury. (*Wash, supra,* 6 Cal.4th at p. 254.) Under these facts, we find the trial court did not err in limiting voir dire to general questions concerning pretrial publicity. (See *Mu'Min* v. *Virginia* (1991) 500 U.S. 415, 428 [114 L.Ed.2d 493, 507-508, 111 S.Ct. 1899] [findings of trial judge on issue of juror impartiality should be upheld absent manifest error].)

### 3. *Alleged Prejudicial Effect of Autopsy Photographs*

■ The trial court admitted into evidence 44 photographs, including 2 photographs of the autopsies of Juan and Juanita Bocanegra depicting the extensive nature of their scalp wounds. (Exhibits Nos. 13 & 14.) The autopsy photographs had been excluded from the guilt phase following a successful motion *in limine* by defendant. The trial court overruled defendant's objection to the admission of the autopsy photographs, however, for the penalty phase. We first review his contention that the trial court erred in admitting the autopsy photographs because they were cumulative, misleading and inflammatory, and their prejudicial effect substantially outweighed their probative value.

In overruling defendant's objection, the court stated: "These scalp wounds are absolutely very important that the jury see. And they are not the kind of autopsy pictures—they're bad, I'll say that, all autopsy pictures are bad, but they're not the blood and guts type of thing that you sometimes see in autopsy pictures. And I think the prejudicial effect is far, far, far, and I can't stress it enough, outweighed by the probative value of these scalp wounds."

Defendant contends the trial court committed prejudicial error in admitting exhibits Nos.13 and 14 in violation of his right to a fair trial and reliable penalty determination under the Eighth and Fourteenth Amendments of the federal Constitution. The thrust of his argument is that the photos were not relevant to the penalty determination, were cumulative to the testimony of Dr. Holloway (the forensic pathologist who performed the autopsies on the Bocanegras), and seriously misled the jury as to defendant's culpability in the Bocanegra murders. In sum, the sole purpose of allowing the photographs, defendant asserts, was to improperly shock and horrify the jury.

Defendant points to the prosecutor's explanation to the jury as to why she believed the autopsy photographs were important evidence and asserts her comment actually exploited the prejudicial effect of the evidence: "You will have the pictures available to you. Look at the scalp wounds. You make the decision. But whatever, [Mrs. Bocanegra] would not have been killed but for the help of Teddy Brian Sanchez, and he is just as guilty of the murder as Joey Bocanegra." Defendant claims that because the probative value of the photographs was clearly outweighed by their prejudicial effect, their admission violated his constitutional rights.

The decision whether to admit photographs is within the trial court's discretion and will not be disturbed unless their prejudicial effect substantially outweighs their probative value. (See *People* v. *Hardy* (1992) 2 Cal.4th 86, 199 [5 Cal.Rptr.2d 796, 825 P.2d 781] [hereafter *Hardy*] [admission of photos at penalty phase within trial court discretion unless prejudicial effect outweighs probative value]; *Wharton, supra,* 53 Cal.3d at p. 596 [same].) We have examined exhibits Nos. 13 and 14 and have determined "they are not so horrific or shocking that we can conclude the trial court abused its discretion in admitting them." (*Hardy, supra,* 2 Cal.4th at p. 199.) The jury was familiar with the facts of the crime, and the photographs had substantial probative value in demonstrating defendant's culpability as an aider and abettor, and as corroborative of Hernandez's testimony implicating defendant in the crimes. Moreover, the probative value of the photographs was not diminished simply because the scalp wounds alone were not fatal to the victims. The photographs corroborated the testimonial evidence and were "relevant to a determination of the appropriateness of the death penalty." (*People* v. *Raley* (1992) 2 Cal.4th 870, 914 [8 Cal.Rptr.2d 678, 830 P.2d 712], fn. omitted, citing *People* v. *Benson* (1990) 52 Cal.3d 754, 786 [276 Cal.Rptr. 827, 802 P.2d 330], and *People* v. *Thompson* (1990) 50 Cal.3d 134, 182 [266 Cal.Rptr. 309, 785 P.2d 857] ["Defendant's intent to kill or lack thereof was one of the circumstances of the crime."].)

Defendant's claim that there was no dispute as to the circumstances of the murders is not supported by the facts. Defense counsel Frank argued at the penalty phase that defendant should be spared the death penalty if the jury had a "lingering doubt" about the extent of defendant's participation in the Bocanegra killings.

Nor is defendant assisted by *People* v. *Love* (1960) 53 Cal.2d 843, 856-857 [3 Cal.Rptr. 665, 350 P.2d 705], in which we held that the trial court's admission of a photograph showing the victim's face as she was dying, and of a tape recording of her last words as she lay on a hospital table

in extreme pain, was prejudicial because it "served primarily to inflame the passions of the jurors." (*Id.*, at p. 857). Here, by contrast, the autopsy photographs depicting the Bocanegras' scalp wounds were clearly probative of (i) the manner in which the victims were wounded, (ii) defendant's culpability as an aider and abettor, (iii) the malice and aggravation of the crime, and (iv) the appropriate ultimate penalty. (*People* v. *Milner* (1988) 45 Cal.3d 227, 247 [246 Cal.Rptr. 713, 753 P.2d 669]; cf. *Hardy*, *supra*, 2 Cal.4th at p. 199-200.)

Because we find no error in admitting the autopsy photographs, we need not address defendant's claims that admission of other photographs during the penalty phase (exhibits Nos. 9, 18, 19 & 25, depicting the wounds on the Bocanegras and Tatman) did not render harmless the prejudicial effect of the autopsy photos. Nor do we address defendant's related argument that, assuming we conclude the admission of these photographs "undercut the prejudice resulting from the admission" of the autopsy photographs, trial counsel was ineffective for failing to object to their admission. Neither argument is persuasive in light of our conclusion that the court did not err in admitting the autopsy photographs at the penalty phase.[7]

### 4. *Prosecutorial Misconduct*

#### a. *Improper Argument*

Defendant alleges several instances in which he claims Ryals committed prejudicial misconduct by: (1) improperly arguing to the jury that defendant was Tatman's actual killer; (2) erroneously asserting in her opening statement that the Tatman murder weapon was a screwdriver, and that the weapon was seized from defendant; (3) suggesting that the jury was sentencing defendant for the Tatman murder when the penalty phase applied only to the Bocanegra murders; (4) presenting false evidence; (5) failing to correct allegedly misleading information regarding the cause of Juan Bocanegra's death; and (6) misstating the evidence of defendant's involvement in the Bocanegra murders.

Defendant failed to object to any of these alleged instances of misconduct, or to seek a curative admonition. He has therefore waived the issues for

---

[7]In an abbreviated argument, defendant contends that the trial court erred when it overruled his objection to the admission of photographs depicting the bloodstains at the Bocanegra residence (exhibits Nos. 32-43, 55-66) on the basis of improper foundation. As the People observe, the trial court properly concluded that the alleged evidentiary deficiencies affected the weight the jury was to give the photographs and not their admissibility.

appeal. (*Hardy, supra,* 2 Cal.4th at p. 171; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant seeks exception to the waiver rule by asserting that a timely objection would have been futile or could not have cured the harm (27 Cal.3d at pp. 28, 34). We do not agree. An objection from defendant could have cured any harm and defendant fails to demonstrate otherwise.

Moreover, any error that did occur was harmless. As we explain in detail below, although the prosecutor may have, at times, pushed the limits of proper advocacy, any misconduct that did occur could not have contributed to the verdict and was thus rendered harmless.

Defendant contends Ryals improperly told the jury that he was Tatman's actual killer, and that Tatman was killed with a screwdriver seized from him. Defendant also asserts that Ryals improperly treated defendant's conviction under section 187 (without special circumstances) as a capital crime. Her argument, claims defendant, violated the doctrines of collateral estoppel and double jeopardy, and denied him his constitutional rights under both the state and federal Constitutions.

Defendant's first claim, that the prosecutor improperly argued to the jury that he was Tatman's actual killer, was based on the following comments made during the prosecutor's closing argument:

"First, Mr. Tatman, an old, sick man, wheelchair bound, living from payday to payday in the Bakersfield Inn, hardly a match for the defendant alone much less for the defendant and his friend, Robert Reyes.

"Think of the old man lying in his bed, fearful because there were burglars in his little room at the Bakersfield Inn. Think of how that fear turned to horror as he realized that they weren't just burglars but that they intended to take his life. Imagine how he must have felt when they approached him.

"Of course, the defendant told the police that he had no actual part in the murder, that he watched his buddy do it. But then, when you think of that, think that the defendant learned to lie to authorities at an early age, I believe Dr. Wright said the third grade. Remember that he denied to the police also anything or any facts concerning the Bocanegra murders, but then remember what he told Rufus Hernandez.

"He told Rufus Hernandez what happened, how the two of them killed Mr. Tatman, not how Robert [Reyes] killed Mr. Tatman or how he killed Mr.

Tatman but how they killed Mr. Tatman. Think of that when you are considering what the penalty in this case should be.

"The two men could have taken the food. They could have taken the refrigerator. They could have taken everything that was in that room and not touched that old man who weighed less than one hundred pounds. They could have gone into that room, completely cleared it out, even stripped the bed clothes out from under him and never harmed him, never hurt him at all. But they didn't do that. The defendant didn't do that. They chose, for some useless, senseless reason, to commit an act of violence, the ultimate, ultimate act of violence, murder."

In her rebuttal, the prosecutor told the jury that it should not attempt to relitigate the guilt phase facts, but then asked the jury to deliberate over what she had told it: "You do not know what evidence was presented in the previous hearing. You are not to relitigate that at this time. You hear[d] the circumstances of the Tatman murder. You know what the defendant told the police because you heard that. But you also know what the defendant told Rufus Hernandez because you heard that. It is up to you to weigh this and to deliberate on that and to determine who exactly struck the fatal blow."

Defendant asserts that the effect of the above argument was to ask "the jury to disregard completely the trial court's not true verdict on the robbery murder special circumstance under Count I which implicitly and necessarily rejected the charges that [defendant] was the actual killer in the Tatman homicide and that he harbored an intent to kill in committing the crime." Defendant claims Ryals's argument sought to elevate a noncapital murder to which defendant was an accomplice into a capital murder in violation of the guarantee against double jeopardy following acquittal under the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution, and the related doctrine of collateral estoppel. (See e.g., *Bunnell, supra,* 13 Cal.3d at pp. 610-602; see also *Ashe* v. *Swensen* (1970) 397 U.S. 436, 445 [25 L.Ed.2d 469, 476, 90 S.Ct. 1189] [barring relitigation of ultimate issue of fact determined in prior litigation]; *Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995] [applying similar standard in state case].)

In making his argument, defendant points to the court's guilt phase verdict, in which the court found defendant acted as an accomplice (and not the actual killer) in the Tatman murder:

"As to the first count [the Tatman murder], the Court finds defendant guilty of murder and fixes that murder as murder in the first degree based on the felony murder rule.

"The Court finds that it is not true that the murder of Woodrow Wilson Tatman was committed while the defendant was engaged in the commission or attempted commission of a felony, to wit: The crime of robbery, within the meaning of the special circumstance section. That does not mean, I hasten to add, that I do not think there was a robbery in progress; that simply means that I find that the defendant was an aider and abettor of the robbery but that the homicide occurred in the commission of that, and therefore it's a first degree felony murder."

The People observe that this verdict appears inconsistent. The confusion over the verdict is highlighted by the fact that early in the guilt phase arguments, the prosecutor appeared to concede (and the court appeared to agree) that defendant could be found guilty only of second degree felony murder in connection with the Tatman killing. Of course, any inconsistency in the verdict was harmless in light of our law recognizing that accomplice status is sufficient to elevate a defendant's complicity in the crime to the robbery-murder special circumstance as long as defendant acted with "intent to kill." (*People* v. *Anderson, supra,* 43 Cal.3d at pp. 1138-1139.)

What is clear from the verdict is the court's finding that defendant aided and abetted the robbery, and that the murder verdict was based on the felony-murder rule. It is less clear, however, whether the court found defendant was or was not the actual killer. If we assume the court found the special circumstance untrue because the prosecution had proved neither that defendant was the actual killer, nor that he had the intent to kill, prosecutorial argument attempting to relitigate the guilt phase as to actual killer status was improper. (*People* v. *Haskett, supra,* 30 Cal.3d at pp. 864-866 [prosecution at penalty phase must refrain from attacking acquittals or retrying charges on which guilt phase jury could not agree].) To the extent Ryals crossed the line of proper argument, however, any misconduct was not prejudicial to defendant because it is not reasonably possible a result more favorable to the defendant would have occurred. Defendant was convicted of the multiple murders of Juan and Juanita Bocanegra (§ 190.2, subd. (a)(3)), and the jury was aware of defendant's prior violent criminal activity (§ 190.3, factors (b) & (c)). Thus, Ryals's references to defendant's role in the Tatman murder could not have affected the outcome of the penalty phase. (*People* v. *Montiel* (1993) 5 Cal.4th 877, 918 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [hereafter *Montiel*].)

Defendant next claims that the prosecutor deliberately misled the jury by her opening statement comment that Tatman was actually murdered by Reyes with a screwdriver that had been stolen from the Bocanegra residence and later found on defendant's person. (See Bus. & Prof. Code, § 6068, subd. (d) [duty of attorney never to mislead a judge by false statement of fact or law]; *People* v. *Bell* (1989) 49 Cal.3d 502, 536-540 [262 Cal.Rptr. 1, 778 P.2d 129] [improper for prosecutor to mislead judge or jury by misstating facts or law].) Defendant asserts the prosecutor's comment contradicted guilt phase evidence indicating that Tatman was mortally wounded by a "massive blunt force injury to the left chest," consistent with a heel stomp or blow by a similar object (with a dimension of two to three inches). According to the autopsy report, the screwdriver wounds were superficial stab wounds that did not actually contribute to Tatman's death. Accordingly, defendant contends, the prosecutor's misstatement of the evidence rendered the penalty phase fundamentally unfair (see, e.g., *Darden* v. *Wainwright* (1986) 477 U.S. 168, 183 [91 L.Ed.2d 144, 158, 106 S.Ct. 2464] [egregious prosecutorial misconduct violates Fourteenth Amendment]), and unreliable (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 340-341 [86 L.Ed.2d 231, 246-247, 105 S.Ct. 2633]).

Any inaccurate reference to the screwdriver as the actual murder weapon (or comment that the weapon was found on defendant) could not properly be characterized as prejudicial or so egregious as to deny defendant a fair trial. (*People* v. *Wrest* (1992) 3 Cal.4th 1088, 1108 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) When, as here, the point focuses on the prosecutor's comments to the jury, the question is whether there is a reasonable possibility that the jury construed or applied any of the complained-of remarks in an objectionable manner. (*Berryman, supra*, 6 Cal.4th at p. 1072.)

Here, the jury was told that only nonfatal stab wounds were inflicted upon Tatman. Forensic pathologist Holloway testified that the cause of Tatman's death was massive blunt force injury to his chest. Holloway also stated that some of the injuries sustained by Tatman were multiple superficial stab wounds to the chest "none of which would be construed as capable of a cause of death in themselves," and a superficial stab wound to the abdomen which "would not itself have been a fatal wound."

In addition, Bakersfield Police Detective Boggs testified that, on March 23, 1987, defendant told him that after he and Reyes had entered Tatman's hotel room, he saw Reyes standing over Tatman in a threatening manner with a screwdriver in his hand, that Reyes "freaked out" and stabbed Tatman with a screwdriver although defendant never saw the screwdriver enter Tatman's body, and that Reyes "possessed the screwdriver at all times."

Moreover, the jury was consistently admonished by the court that it was to consider only the evidence presented, and that the opening statements of the lawyers were not to be considered evidence. The court admonished the jury that: "The important thing to remember is that what lawyers say in a trial, what they say in their argument, what they say in their opening statements, those simply are not evidence. They are just telling you what they expect to prove. [¶] You have to decide this case, however, based on what you hear under oath from the witness stand or based on some documents or pictures that I admit for your consideration. [¶] What a lawyer says . . . is not evidence." (See CALJIC No. 1.02.) The court repeated its admonition following closing arguments.

Taken in context as an attempt to counter defense counsel's argument that defendant did not participate in the Tatman killing, it is not reasonably possible the prosecutor's alleged inaccurate remarks about the Tatman murder misled the jury. (*Berryman, supra,* 6 Cal.4th at p. 1072.) Moreover, the court's instruction that the lawyers' opening and closing statements were not to be considered evidence by the jury vitiated the misleading effect of any inaccurate remarks. The court's instructions are determinative in their statement of law, and we presume the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade. (*People* v. *Thomas, supra,* 2 Cal.4th at p. 538.) We cannot conclude on this record that the prosecutor's isolated mischaracterization of the evidence in her opening statement misled the jury.

 Defendant also asserts that by discussing the circumstances of the Tatman killing during the penalty phase, the prosecutor improperly misled the jury into believing it could sentence defendant to death for the murder of Tatman alone, when the penalty should have been considered only for the Bocanegra crimes, in which the multiple-murder special circumstance was found true.

Defendant's argument is misplaced. The circumstances of the Tatman crime were properly argued as an aggravating factor under section 190.3, factor (a) (circumstances of the crime and the existence of any special circumstances found to be true pursuant to section 190.1). (See *Montiel, supra,* 5 Cal.4th at p. 938, fn. 33 [factor (a) of section 190.3 covers the circumstances of all crimes adjudicated in the capital proceeding].) Moreover, defense counsel reminded the jury of defendant's aider and abettor status in the Tatman murder when he stated: "Ted Sanchez did not kill Mr. Tatman nor did he share in Robert Reyes's intent to kill Mr. Tatman. Ted's role in that tragic incident was limited to removing some of Mr. Tatman's property." Hence, we find no prosecutorial error occurred in Ryals's discussion of the circumstances of the Tatman murder at the penalty phase.

Defendant's other claims of prosecutorial misconduct to which there was no defense objection are not supported by the record. For example, defendant's contention that the prosecutor allowed Detective Boggs to testify falsely as to who told him—Reyes or defendant—that both men had "kicked back" and "relaxed" after the Tatman murder, is simply a disagreement as to the interpretation of the evidence, and in no way indicates that Ryals encouraged or elicited false testimony from Boggs. In addition, the prosecutor did not commit misconduct in failing to correct Dr. Holloway's characterization of the nonfatal scalp wounds to Juan Bocanegra as a "contributory cause" rather than an "other condition" of death. The characterization of the scalp wounds as contributing to Juan's death was minimally significant to the jury's assessment of defendant's culpability in the murders. The facts showed that defendant struck disabling blows to the victim's head while Joey was stabbing him. Moreover, any misperceptions of the cause of Juan's death were corrected by the prosecutor's opening statement that the wounds inflicted by defendant with a metal bar, "were not the actual blows that killed the man. They were only a part of what killed the man. The actual blow to the man was the stab wound inflicted by his son while defendant was beating him in the head with an iron pipe."

Finally, defendant's claim that the prosecutor committed misconduct by asserting that the Bocanegras would not have been killed without defendant's assistance is without merit. The evidence supported the view that defendant restrained both victims while Joey Bocanegra stabbed them. "The argument came well within the broad discretion of the parties to state their views as to what the evidence shows and what inferences may be drawn therefrom." (*People* v. *Kelly* (1992) 1 Cal.4th 495, 540 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

b. *Ineffective Assistance of Counsel*

Defendant complains that counsel's failure to object to the above alleged misconduct amounted to prejudicial ineffective assistance of counsel. This claim lacks merit. (See *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-216.) In his closing argument, cocounsel Frank consistently pointed out the prosecution's inaccurate statements to the jury, reminding it of the evidence presented. Counsel's performance in demonstrating for the jury the prosecutor's improper argument reveals counsel's attention to detail rather than incompetence. Counsel's careful references during the prosecutor's misstatements demonstrates that defense counsel was aware of the misstatements and, in exercising reasonable professional judgment, chose not to object for tactical reasons. In any event, we find no reasonable probability that defense counsel's failure to object prejudiced defendant's case. (*Ibid.*)

### c. Cross-examination of Robin Sanchez

 As previously noted, defendant's wife, Robin Sanchez, testified in mitigation that defendant was a nice, trustworthy person who baby-sat her children. On cross-examination of the witness, Ryals asked her whether she was "aware of the fact that [defendant has] been violent since he's been in jail?" Sanchez replied, "no." Defense counsel objected to the question and the trial court admonished the jury to disregard it. Thereafter, Ryals told the court that she had one more rebuttal witness whose testimony would be "very, very, short," and the trial was continued a day in order to allow her to locate the witness. When the court reconvened, it granted defendant's request for an offer of proof with regard to the rebuttal witness, in response to which the prosecutor withdrew her proposed presentation of the witness.

Defendant claims that the prosecutor deliberately used her cross-examination to place an "insupportable insinuation" that defendant was violent while in custody without proof of the alleged conduct in violation of *People* v. *Bell, supra*, 49 Cal.3d 502, 532 [counsel's deliberate asking of questions calling for inadmissible answers is misconduct].)

We find no error. Defendant's wife was cross-examined by the prosecutor in response to her testimony that defendant was a nice and trustworthy person who babysat her children. "It is well established that the prosecution may inquire of a defense . . . witness whether he [or she] has heard of acts or conduct by the defendant inconsistent with the witness's testimony so long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually took place. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 578 [247 Cal.Rptr. 729, 754 P.2d 1306].)" (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 188-189 [14 Cal.Rptr.2d 342, 841 P.2d 862].)

In addition, the court sustained defendant's objection to the testimony, admonishing the jury to disregard it. The jury was also instructed: "As to any question to which an objection was sustained, you must not guess as to what the answer might have been or as to the reason for that objection. [¶] You must never assume to be true any insinuation suggested by a question which was put to a witness. [¶] A question is not evidence and may be considered only as it supplies meaning to the answer which follows it. And you must not consider for any purpose any offer of evidence that was rejected or any evidence that was stricken out by the court. [¶] Such matter is to be treated as though you have never heard it." Given the fact that three first degree murder and two prior assault convictions were properly before the jury, any

improper information the jury may have received regarding defendant's propensity for violence in jail could not have affected the jury's verdict. (See *Montiel, supra,* 5 Cal.4th at p. 930.) Under these circumstances, there is no reasonable possibility that the jury would have reached a more favorable verdict in the absence of the alleged misconduct. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 448-449 [250 Cal.Rptr. 604, 758 P.2d 1135]; see also *Chapman* v. *California* (1968) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

### d. *Discussion of the Meaning of "LWOP" Sentence*

During closing argument, Ryals told the jury that it should "think of Mr. Tatman, think of Mr. and Mrs. Bocanegra, Juan and Juanita Bocanegra, not because you feel sorry for them, not because of passion, but in considering the horror those people must have felt on the evening before they died. Then think of the meaning of life without the possibility of parole. It means being alive. It means eating three meals a day. It means watching television. It means having a library, a gymnasium. It means having conjugal visits with your wife." Defense counsel's objection to the argument was sustained, and the jury was admonished to disregard "the statement about what life without possibility of parole was like after three meals a day." Defendant contends the above comment improperly swayed the jury to vote in favor of death.

We disagree. Nothing in counsel's argument carried the improper suggestion that the jury should not take seriously its sentencing responsibility. Ryals's brief statement would be interpreted by a reasonable jury as an attempt to contrast "victim impact" evidence against the penalty the prosecution believed defendant deserved. Such evidence is allowed under both federal and state precedent. (*Payne* v. *Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 833-836 [1 Cal.Rptr.2d 696, 819 P.2d 436] [concluding that the immediate injurious impact of a capital murder may be introduced as a "circumstance of the crime" under section 190.3, factor (a)]). We find no basis for reversal in the prosecutor's argument.[8]

---

[8] In a footnote in his brief, defendant observes that before the penalty trial, the trial court granted his request that the jury not be told who was the trier of fact in the guilt phase. Defendant now claims that the prosecutor's two references to a jury as the trier of the guilt phase was deliberate misconduct calculated to mislead the jury. Defense counsel, however, refused a curative instruction, believing that such an admonition would highlight the harm caused by the prosecutor's comments.

Defendant asserts that even though the comments about the trier of fact did not amount to reversible error, they suggest "a willingness by the district attorney to overstep the limits of proper argument." Although the prosecutor pushed the limits of proper advocacy by referring

### 5. Court's Reading of Guilt Phase Verdicts

 Prior to penalty phase arguments, at defense counsel Frank's request, the trial court read the information and summarized the guilt verdict, including the special circumstances findings, for the jury. In summarizing the verdict, the court purported to read from the August 3, 1988, minute order which had omitted the verdict as to certain allegations charged in the information. For example, defendant had been charged in the information with the multiple-murder special circumstance (§ 190.2, subd. (a)(3)) with respect to the Tatman and Bocanegra murders. The August 3 order found true the multiple-murder special circumstance with respect to the Bocanegra murders only and did not include the Tatman murder in the special-circumstance disposition. Purporting to read from the August 3 minute order, the court inexplicably included Tatman as part of the section 190.2, subdivision (a)(3) finding when it summarized the verdict to the jury. That finding is not in the record copy of the minute order.

Also during penalty phase argument, Frank explained to the jury the meaning of the felony-murder charges in the Tatman verdict, and discussed defendant's role as an accomplice in the Tatman robbery and murder in an apparent attempt to clarify the court's allegedly inconsistent verdicts finding defendant guilty of the first degree murder and robbery of Tatman, but finding not true the robbery-murder special circumstance. Frank's explanation of the felony-murder verdict was interrupted by Ryals's successful objection. Defendant now complains that the court's erroneous inclusion of the Tatman murder as part of the multiple-murder special-circumstance finding in the Bocanegra murders, and its failure to explain (or allow counsel to adequately explain) its allegedly inconsistent verdict and special-circumstance finding in the Tatman murder verdicts amounted to "the use of false or misleading evidence in capital sentencing" in violation of defendant's Fourteenth Amendment right to due process, and the Eighth Amendment right to a fair trial. (See *Simmons* v. *South Carolina* (1994) 512 U.S. 154, __, fn. 5 [129 L.Ed.2d 133, 143-144, 114 S.Ct. 2187, 2195] [due process requires sentencing jury be informed that defendant is ineligible for parole where defendant's future dangerousness is at issue and state law prohibits defendant's release on parole]; *Townsend* v. *Burke* (1948) 334 U.S. 736, 740-741 [92 L.Ed. 1690, 1693-1694, 68 S.Ct. 1252] [reliance on dismissed charges not proved in noncapital sentencing denied defendant due process]; *Johnson* v. *Mississippi* (1988) 486 U.S. 578, 584 [100 L.Ed.2d 575, 583-584, 108 S.Ct. 1981] [reversing death sentence on Eighth Amendment grounds

---

to the guilt phase trier of fact as a "jury," any misstep made during the course of the penalty trial was harmless.

for counsel's use of prior conviction that had been reversed]; see also *People v. Melton* (1988) 44 Cal.3d 713, 748, fn. 12 [244 Cal.Rptr. 867, 750 P.2d 741] [hereafter *Melton*] [robbery-murder special-circumstance finding as to accomplice requires finding of intent to kill].)

We find defendant's arguments unpersuasive. First, counsel did not object to the court's incorrect reading of the multiple-murder special-circumstances verdict. Hence, if any error occurred, it was waived. (*Hardy, supra,* 2 Cal.4th at p. 171.) Moreover, even if counsel had objected, we would find any error the court made in reading incorrectly the multiple-murder special-circumstance findings, or any confusion caused by the court's verdict as to the Tatman charges, could have been rendered harmless by an admonition to the jury.

In addition, Frank's penalty phase argument explained to the jury the meaning of the Tatman verdict: "The significance of what [defendant] was and wasn't convicted of, I would submit to you, establishes a lot of facts, number one, that he himself did not kill Woodrow [Wilson] Tatman. You heard the evidence. I think you can infer from the evidence, from the verdicts that it was not Ted Sanchez who killed Mr. Tatman, it was Robert Reyes. [¶] I submit to you that you can logically infer from what you've heard that Ted Sanchez did not kill Mr. Tatman nor did he share in Robert Reyes' intent to kill Mr. Tatman. Ted's role in that tragic incident was limited to removing some of Mr. Tatman's property. [¶] You heard the evidence. Mr. Tatman was not supposed to even have known that his property had been taken. . . ."

Frank next repeated to the jury: "Robert Reyes took it upon himself to kill, but Ted had no part in that." Frank then explained the multiple-murder special-circumstance findings and argued the circumstances of the Bocanegra murders as a mitigating factor under section 190.3, factor (a).

"Now let's turn to the charges involving the Bocanegras. Teddy was charged in count two of the Information with having killed Mr. Bocanegra and in count three of the Information with having killed Mrs. Bocanegra. Each count carried with it the special circumstance that the murder had been committed during the course of a robbery. Although he was found guilty of the murders of Mr. and Mrs. Bocanegra, the special circumstance that the murders occurred during the course of a robbery were not found true. In addition, he was found not guilty of robbing the Bocanegras as was alleged in count five.

"I submit to you that the importance of all this is that you can infer that when Ted—that when Ted went over to the Bocanegra house he did not do

so with the intent to rob him. In fact, I would submit that you can infer that when he went over to that house he didn't intend to commit any criminal acts against the Bocanegras, and that it wasn't until after Joey and his father started fighting that Teddy thought about engaging in any criminal activity.

"Now, I bring all this to your attention because the law says that you can take into account the circumstances of the crimes when you deliberate on the issue of penalty, and that is provided for in . . . [section 190.3, factor (a)].

"Now this factor is general, looked upon as being an aggravating factor, one that doesn't usually contain any mitigating value, but I submit to you that, in this case, if you look closely at the facts and circumstances of what transpired at the Tatman and Bocanegra residence[s], you will find significant mitigating values there."

Frank thereafter told the jury that it was Reyes, not defendant, who killed Tatman, and that defendant "had no criminal intent when he went over to [the Bocanegras'] house." He also argued that these same facts could be interpreted as mitigating evidence under section 190.3, factor (k). Frank's argument likely clarified for the jury any misperceptions about the verdict that occurred in light of the court's statement of the verdict.

We conclude any error the court made in the court's verdict statement was harmless. Defendant requested the court read the verdict and special circumstance findings, and failed to correct the court or offer clarifying instructions in order to remedy any misperceptions the jury may have had about the verdict. Moreover, counsel's explanation of the verdict to the jury during argument more than clarified any potential confusion the jury may have experienced following the court's explanation. The prosecutor did not mention the erroneous verdict, or capitalize on its inclusion. Defendant was convicted of three counts of first degree murder, including one supportable special-circumstance allegation, as well as two counts of use of a deadly weapon, and one count of robbery. Under these circumstances, there is no reasonable possibility that consideration of the court's potentially confusing reading of the guilt phase verdict could have improperly influenced the jury. (Cf. *People* v. *Jennings* (1991) 53 Cal.3d 334, 389-391 [279 Cal.Rptr. 780, 807 P.2d 1009] [any error in court's failure to tailor instruction that the jury "consider all evidence," even those charges of which defendant was acquitted, rendered harmless by instructions and other valid charges].)

6. *Alleged Instructional Errors*

Defendant contends several instructional errors occurred at the penalty phase.

### a. *Residual Doubt*

■ Defendant asserts the trial court violated the state and federal constitutional provisions guaranteeing due process, equal protection, and a fair trial by erroneously rejecting his proffered instruction on "residual or lingering doubt." Defendant's proposed instruction asked the jury to "consider as a mitigating factor residual or lingering doubt as to Mr. Sanchez's guilt for the crimes of which he has been convicted." Although defendant recognizes that the state and federal Constitutions do not *require* a residual doubt instruction, he asserts the instruction should have been given in this case because it was warranted by the evidence. He relies on section 190.3, factor (f), which gives the judge discretion to instruct the jury "on any points of law pertinent to the issue," and case law that holds section 190.3, factor (f) may require a court to give the "residual doubt" instruction should the evidence warrant it. (*People* v. *Cox* (1991) 53 Cal.3d 618, 678, fn. 20 [280 Cal.Rptr. 692, 809 P.2d 351] [hereafter *Cox*] [evidence may require residual doubt instruction]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 134 [246 Cal.Rptr. 245, 753 P.2d 37] [court may consider residual doubt of defendant's intent during penalty phase of capital trial]; cf. *People* v. *Kaurish* (1990) 52 Cal.3d 648, 705-706 [276 Cal.Rptr. 788, 802 P.2d 278].) Claiming that the evidence was insufficient to find him guilty of the first degree murders of Mr. and Mrs. Bocanegra, defendant contends "residual doubt" was "a circumstance of the capital crimes that could be considered by the jury under both [section] 190.3, factors (a) and (k)."

We find no error. It is true, as defendant claims, that the jury's consideration of residual doubt is proper; defendant may assert his possible innocence to the jury as a factor in mitigation under section 190.3, factors (a) and (k). (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1259-1262 [14 Cal.Rptr.2d 702, 842 P.2d 1]; cf. *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248].) But there is no *requirement*, under either state or federal law, that the court specifically instruct the jury to consider any residual doubt of defendant's guilt. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173-174 [101 L.Ed.2d 155, 165-166, 108 S.Ct. 2320]; *Cox, supra,* 53 Cal.3d at pp. 677-678; see also *People* v. *Medina* (1995) 11 Cal.4th 694 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Here, the trial court instructed the jury that it could consider "[t]he circumstances of the crime of which defendant was convicted in the present proceeding and the existence of any special circumstance found to be true" (§ 190.3, factor (a)), and "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that

the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial" (*id.*, factor (k)). These instructions on the scope of mitigating circumstances sufficiently encompassed the concept of residual doubt about defendant's guilt. (*People* v. *Price* (1991) 1 Cal.4th 324, 488 [3 Cal.Rptr.2d 106, 821 P.2d 610] [rejecting defendant's claim that the court erred in failing to specifically instruct on residual doubt when jury was properly instructed under section 190.3, factors (a) and (k)].)

In addition, as we have observed, defense counsel told the jury that the circumstances of the crimes could be viewed as mitigating evidence of defendant's intent to kill. He also emphasized to the jury that section 190.3, factor (k) allows it to "consider any aspect of the defendant's character or record that he offers as a basis for a sentence less than death," and asked the jury whether it had "some lingering doubts about what [it] would have seen" if it had been inside the Bocanegra residence at the time of the murders. In light of the proper instructions given to the jury, and counsel's argument, we conclude the trial court did not err in rejecting defendant's specific instruction on lingering doubt. (*People* v. *Johnson, supra,* 3 Cal.4th at p.1252.)

### b. *Overlap Between Section 190.3 Factors (a), (b), and (c)*

■■■ Section 190.3 requires the jury to consider the circumstances of the offense (§ 190.3, factor (a)), the presence of violent criminal activity (*id.*, factor (b)), and prior felony convictions (*id.*, factor (c)). The jury was instructed in the statutory language. (Former CALJIC No. 8.84.1.) Defendant now claims the court erred by failing to clarify the differences between the above factors, thus allowing the jury to give multiple consideration to the aggravating evidence under all these factors. He also asserts that the instructions erroneously permitted the jury to consider defendant's prior assaults under both factors (b) and (c), and improperly inflated the weight the jury should have given to either prior crime.

We have noted that section 190.3, factor (b), concerns crimes other than those for which defendant is being prosecuted (*Melton, supra,* 44 Cal.3d at p. 763; *People* v. *Fudge* (1994) 7 Cal.4th 1075, 1125 [31 Cal.Rptr.2d 321, 875 P.2d 36] [hereafter *Fudge*]), and we have directed that courts should give clarifying instructions "to avoid any confusion" that may be caused by the above factors. (*Montiel, supra,* 5 Cal 4th at pp. 887, 938; *People* v. *Miranda* (1987) 44 Cal.3d 57,106, fn. 26 [241 Cal.Rptr. 594, 744 P.2d 1127].) But we have consistently found that the absence of clarifying instructions is harmless (*Montiel, supra,* 5 Cal.4th at p. 938), and that the standard instructions

do not "inherently encourage 'double-counting' under section 190.3." (*People* v. *Pride, supra,* 3 Cal.4th at p. 269; *People* v. *Bonin* (1988) 46 Cal.3d 659, 703 [250 Cal.Rptr. 687, 758 P.2d 1217].) Therefore, "even if one or more jurors mistakenly consider a particular criminal incident under the wrong factor, there is little risk that a reasonable jury will give a single incident duplicative consideration." (*Montiel, supra,* 5 Cal.4th at p. 939; *Fudge, supra,* 7 Cal.4th at p. 1125.) Moreover, both the prosecutor and defense counsel separately explained the proper use of the evidence under the separate factors. Thus, any potential confusion the jury may have faced in light of the instructions was adequately addressed by both counsel's arguments. Accordingly, given the arguments and the absence of any improperly admitted evidence, we find that the court's failure to clarify the scope of each factor did not affect the outcome of the trial.

### c. Other Claims of Instructional Error

Defendant raises several other contentions which he acknowledges have been rejected by this court. He raises the issues to preserve federal review.

#### (i) Former CALJIC No. 8.84.1

Defendant contends the court erred when it rejected his request to delete inapplicable mitigating factors (e) (whether victim participated in crime) and (f) (moral justification for crime) of section 190.3 from its standard statutory instructions, and injected irrelevant considerations into the jury's penalty deliberations, depriving him of his right to a fair and reliable penalty determination under the Eighth and Fourteenth Amendments.

The jury, however, was properly instructed to consider all the factors "if applicable" and later told to "take into account and be guided by" the applicable factors. (Former CALJIC No. 8.84.1; *Fudge, supra,* 7 Cal.4th at p. 1126.) As we have in previous cases, we assume the jury properly followed the instruction and concluded that mitigating factors not supported by evidence were simply not "applicable." (*Ibid.*)

#### (ii) Nonstatutory Aggravating Factors

Defendant also asserts the trial court erred by failing to instruct the jury not to consider nonstatutory aggravating evidence in determining penalty. We have repeatedly rejected this contention, and defendant has not persuaded us to reconsider our conclusion. (See e.g., *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 79-80 [14 Cal.Rptr.2d 133, 841 P.2d 118] [hereafter

*Hawthorne*].) Nor was the trial court required to label various factors as exclusively aggravating or mitigating. (*Montiel*, supra, 5 Cal.4th at p. 943 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 784 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

### (iii) *Limiting Modifiers*

Defendant contends the trial court violated the Eighth Amendment by refusing his requested deletion of the adjectives "extreme" and "substantial" in instructions given in the language of section 190.3, factors (d) (whether defendant was under the influence of extreme mental or emotional disturbance at time of offense), and (g) (whether defendant acted under extreme duress or substantial domination of another person). We have rejected this argument in numerous cases, and defendant has failed to persuade us that we should reconsider these decisions. (*Turner*, supra, 8 Cal.4th at pp. 208-209, and cases cited [catchall provision of section 190.3, factor (k) referring to "any other circumstance which extenuates the gravity of the crime" allows consideration of nonextreme mental or emotional conditions when read in conjunction with instructions on factors (d) and (g)].)

### (iv) *Former CALJIC No. 8.84.2*

Defendant contends the trial court violated the federal Constitution by rejecting his instruction that would have required the jury unanimously to find the existence of an aggravating factor before considering it and to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors before choosing the penalty of death. Instead, the court instructed the jury pursuant to former CALJIC No. 8.84.2, which informed the jury it must "be guided by the applicable factors of aggravating and mitigating circumstances upon which [it] had been instructed." The instruction also emphasized to the jury that the penalty determination did not involve a mere mechanical weighing process, but required an individual assessment of the aggravating and mitigating circumstances (and assignment of "whatever moral or sympathetic value" it deemed appropriate) in determining the sentence. Defendant claims CALJIC No. 8.84.2 failed to inform the jury it must find that the aggravating factors outweighed the mitigating factors and that, if it found mitigating factors outweighed aggravating factors, it must impose a sentence of life without parole. We have previously rejected these contentions, and defendant has failed to persuade us to reconsider our decisions. (*See Cox*, supra, 53 Cal.3d 618, 692.)

As we have previously recognized, nothing in the federal Constitution requires the jury unanimously to find the existence of an aggravating factor,

or to find beyond a reasonable doubt that the People proved each aggravating factor, that the aggravating circumstances outweighed the mitigating ones, or that death is appropriate. (*Hawthorne, supra,* 4 Cal.4th at p. 79; *People v. Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) Unlike the determination of guilt, "the sentencing function is inherently moral and normative, not factual" (*Rodriguez, supra,* 42 Cal.3d at p. 779), and thus "not susceptible to a burden-of-proof quantification." (*Hawthorne, supra,* 4 Cal.4th at p. 79.)

Nor do we agree with defendant that CALJIC No. 8.84.2 is impermissibly vague or misleading under *Stringer v. Black* (1992) 503 U.S. 222 [117 L.Ed.2d 367, 112 S.Ct. 1130]. We have held that "assuming our statute is subject to the rationale of *Stringer,* [section 190.3,] factors (a) (circumstances of crimes adjudicated in capital guilt proceeding), (b) (other violent criminal activity), and (i) (defendant's age at time of capital crime) withstand vagueness challenges. Each of these factors '[directs] the sentencer's attention to specific, provable, and commonly understandable facts about the defendant and the capital crime that might bear on his moral culpability. . . .' (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; see also *People v. Noguera* (1992) 4 Cal.4th 599, 648-649 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People v. Proctor* [1992)] 4 Cal.4th 499, 550-551 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) Similar considerations apply to factor (c) (prior felony convictions), and to factors (d) through (k), which further channel the sentencer's discretion by identifying additional [specific and provable facts] about the capital offense and offender which the state properly deems pertinent to the penalty determination." (*Montiel, supra,* 5 Cal.4th at p. 944, fn. omitted.)

Finally, defendant complains about the following portion of the jury instructions: "To return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that it warrants death instead of life in prison without parole." (Former CALJIC No. 8.84.2.) Defendant asserts that the words "so substantial" are impermissibly vague and lead to an arbitrary penalty verdict. As the People point out, we rejected the identical argument in *People v. Sully* (1991) 53 Cal.3d 1195, 1244-1245 [283 Cal.Rptr. 144, 812 P.2d 163], in which we observed that the instruction adequately conveyed to the jury that it must be persuaded that the "bad" evidence is so substantial in comparison with the "good" evidence, that death is the appropriate penalty. (*Id.,* at p. 1244.) Former CALJIC No. 8.84.2 adequately conveyed to the jury the seriousness of its obligation in determining the appropriate penalty, and we find no error in giving the instruction. (*Sully, supra,* 53 Cal.3d at pp. 1244-1245.)

(v) *Written Findings of Aggravating Factors*

Defendant contends the trial court erred by failing to require the jury to render written findings on the aggravating factors it selected. We have repeatedly held that such findings are not required, and accordingly, find no error. (*Turner, supra,* 8 Cal.4th at p. 209; *Cox, supra,* 53 Cal.3d at p. 692.)

7. *Alleged Davenport Error*

Defendant claims the prosecutor improperly implied that the absence of mitigating evidence under section 190.3, factors (e) and (f) should be considered as aggravating evidence. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) We find no error. The prosecutor simply told the jury that there "was no evidence" of factor (e), and also argued that she could not recall hearing any factor (f) evidence, but that if the jury heard it the evidence could be considered in mitigation. Moreover, the jury was specifically instructed, pursuant to defendant's request, that the "absence of any particular factor in mitigation is not to be treated as any factor in aggravation." It is presumed that the jury followed the court's instruction. (*Turner, supra,* 8 Cal.4th at p. 209.)

8. *Section 190.3, Factor (k)*

Defendant complains that the court erred in rejecting his instructions discussing his childhood and background, that were required to augment the section 190.3, factor (k) instruction. We disagree. The jury was fully aware that it could consider defendant's childhood in mitigation under factor (k); it was further instructed that this factor allowed the jury to consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." In addition, the jury was instructed that it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors" and that [t]o return a judgment of death, each of you must be persuaded that the aggravating evidence and/or circumstances is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." These instructions, combined with the arguments of Ryals (informing the jury it could consider as mitigating defendant's background and character) and Frank (telling jury that factor (k) includes any evidence of defendant's character or background that he offers), lead us to conclude that there is no possibility the jury misunderstood its sentencing obligation to consider defendant's background and character in determining the appropriate penalty. (See *People* v. *Webb* (1993) 6 Cal.4th 494, 534 [24 Cal.Rptr.2d 779, 862 P.2d 779] [hereafter *Webb*].)

### 9. *Proportionality Review*

Defendant complains that the lack of intracase and intercase proportionality review in this case renders the 1978 sentencing scheme under California's death penalty law arbitrary under the Eighth Amendment and in violation of his equal protection rights because such review is afforded to noncapital defendants. We have rejected the argument in numerous cases. (See e.g., *Turner, supra,* 8 Cal.4th at p. 209.)

### 10. *Section 190.4, Subdivision (e) Motion*

 Defendant contends the trial court committed prejudicial error in denying his automatic motion for modification of the death sentence (§ 190.4, subd. (e)) because it failed to consider mitigating evidence of defendant's dysfunctional family and his kindness to his siblings (§ 190.3, factor (k)). We are not persuaded.

After reviewing section 190.3, factors (a)-(i), and concluding that several statutory mitigating factors did not apply to defendant, (the court did note that defendant may have been high on PCP during the murders pursuant to factor (h)), the court asked: "Are there other circumstances that mitigate against the aggravation of the [defendant], I think not." Moreover, before denying the modification motion, the court stated that it had considered defendant's motion to reduce penalty and the People's response, both of which referred to defendant's mitigating evidence. Thus, although the court did not specifically mention defendant's mitigating evidence of his family life, the court's statement regarding section 190.3, factor (k) evidence shows it considered all pertinent penalty phase evidence, including testimony about defendant's family life and his behavior toward his siblings, but merely found it unpersuasive. The record is clear that in ruling on the motion for modification, the trial court independently assessed the weight of the evidence under each factor, and stated its reasons for denying defendant's motion. (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 971 [4 Cal.Rptr.2d 765, 824 P.2d 571].) We conclude on this record that all constitutional and statutory considerations were observed in the court's ruling. (*Hawthorne, supra,* 4 Cal.4th at p. 80.)[9]

---

[9]In a footnote in his brief, defendant complains about the court's statement regarding section 190.3, factor (g) (whether or not defendant acted under extreme duress or substantial domination of another) because the court commented on the brutal nature of the Tatman killing, and mentioned that defendant was helped by Joey Bocanegra in killing Joey's parents. Defendant asserts that the court's "mistake" in summarizing the evidence indicates the court erroneously believed defendant was the "main perpetrator" of all three murders. We note,

### 11. *Cumulative Error*

Defendant claims that in combination, the errors at the penalty phase caused cumulative prejudice warranting a reversal of penalty. After review of the record, we disagree. Any prosecutorial misconduct that did occur did not significantly influence the fairness of defendant's trial or detrimentally affect the jury's determination of the appropriate penalty. (*Ashmus, supra,* 54 Cal.3d at p. 1006.)

### 12. *Disproportionate Penalty*

 Defendant contends his death sentence is disproportionate to his culpability under the Eighth Amendment and article I, section 17 of the California Constitution, which preclude punishment that is disproportionate to a defendant's individual culpability. (*Webb, supra,* 6 Cal.4th at p. 536.) Defendant complains that the constitutional proscription against a disproportionate penalty has been especially violated in this case because his accomplices in the murders received either 25 years to life pursuant to a negotiated plea (Robert Reyes), or had the charges dismissed on insufficient evidence grounds (Joey Bocanegra).

Defendant relies on *People* v. *Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697], in which the court reduced a life sentence imposed on a 17-year-old with no prior convictions for a noncapital first degree felony murder to a sentence for second degree murder. But, as we have subsequently stated, *Dillon* does not mandate the type of intracase proportionality review sought by defendant. (*People* v. *Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984] [hereafter *Hill*].)

As the People observe, intracase proportionality review is "an examination of whether defendant's death sentence is proportionate to his *individual* culpability irrespective of the punishment imposed on others." (*People* v. *Adcox* (1987) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906], italics in original.) "The Eighth Amendment to the federal Constitution does not require us to incorporate into our proportionality determination any comparison of defendant's sentence with that of another culpable person, whether charged or uncharged." (*Hill, supra,* 3 Cal.4th at p. 1014; *Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871] [upholding California's absence of comparative proportionality review].)

---

however, that the court observed defendant could not receive the death penalty for the Tatman murder, and we are not persuaded that the court's brief reference to Joey Bocanegra revealed any confusion about defendant's role in the Bocanegra murders.

Accordingly, we reject defendant's plea for "intracase proportionality." The evidence shows that he committed three brutal first degree murders of innocent and defenseless victims as an accomplice, only thirty-three days after he was released from state prison on parole from an eight-year prison term imposed for two violent assaults. In light of the evidence presented at trial, the penalty is proportionate to *defendant's* culpability. (3 Cal.4th at p. 1014.)[10]

## III. CONCLUSION

Based on the foregoing, we conclude the judgment should be affirmed in its entirety.

Kennard, J., Arabian, J., Baxter, J., George, J., Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment.

I write separately to prevent any misapprehension on the part of the reader as to the meaning of *People* v. *Hendricks* (1987) 43 Cal.3d 584 [238 Cal.Rptr. 66, 737 P.2d 1350], and the vitality of *People* v. *Wright* (1987) 43 Cal.3d 487 [233 Cal.Rptr. 69, 729 P.2d 260]. Both *Hendricks* and *Wright* deal with the requirement of *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], and *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], that, under specified circumstances, a trial court must obtain from a criminal defendant a personal, on-the-record waiver of certain of his rights under the United States Constitution—namely, his privilege against self-incrimination, his right to a jury trial, and his right to confront adverse witnesses. *Hendricks* expressly holds that those circumstances obtain "only when the defendant agrees to a submission procedure . . . by virtue of which he surrenders one or more of the three specified rights." (*People* v. *Hendricks, supra*, 43 Cal.3d at p. 592.) It impliedly holds

---

[10]The People ask that we take judicial notice of a copy of the amicus curiae brief filed by the California Appellate Project (CAP) in *Maynard* v. *Cartwright* (1988) 486 U.S. 356 [100 L.Ed.2d 372, 108 S.Ct. 1853]. Defendant sought notice of the records filed in the Court of Appeal in *People* v. *Reyes* (F016750, app. pending). The People claim the CAP brief is relevant to defendant's contention that the California death penalty statute does not adequately narrow the field of death eligible murders. They assert the brief "represents the opinion of the California death penalty experts to the contrary." As to the *Reyes* records, defendant contends they are relevant to his claims of prosecutorial misconduct and disproportionate penalty, and he observes that the People refer to these records in their brief. We grant the request as to the Californiat Appellate Project brief, but deny the request as to the *Reyes* appellate record for the reasons stated, *ante*, in footnote 5, at pages 59-60.

that the court must take a waiver only as to the right or rights actually surrendered. To the extent that *Wright*, which was decided earlier, is to the contrary, it is no longer good law.

Appellant's petition for a rehearing was denied February 21, 1996, and the opinion was modified to read as printed above. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.